Hart, J.
 

 The demurrer to the petition filed in this case raises questions involving a consideration of the law creating the Public Institutional Building Authority of this state and providing for its powers and duties ; a consideration of the resolution adopted by the authority providing for the issuance of its bonds' to provide money for the repair, alteration or building of state welfare institutions; and a consideration of an agreement entered into between the authority and the Department of Public Welfare for that purpose.
 

 The sole question before the court, as raised by the demurrer, is whether Sections 2332-1 to 2332-13, inclusive, General Code, violate the constitutional prohibition against the creation of debt contained in Article VIII, Sections' 1 and 3 of the Constitution of Ohio, and whether, as a result, the proceedings taken thereunder by the Public Institutional Building Authority, and the Department of Public Welfare of the state, in the form of the resolution and agreement hereinbefore described, are illegal.
 

 Section 1 of Article VIII of the Constitution provides : ‘ ‘ The state may contract debts, to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more acts of the General Assembly, or at different periods of time, shall never exceed $750,000 * *
 

 Section 3 of Article VIII of the Constitution provides :
 

 “Except the debts above specified in Sections one and two of this Article [debts to repel invasions, sup
 
 *612
 
 press insurrection, defend the state in war, or to redeem the present outstanding indebtedness of the state]-, no debt whatever shall hereafter be created by, or on behalf of the state.”
 

 Much litigation has arisen from time to time because of similar limitations in constitutions of this and other states with reference to state indebtedness, and, because of constitutions or statutes limiting the indebtedness of municipal corporations, the question at issue being whether the types of obligations proposed to be entered into by the state or municipality, as the case may be, were “debts” or “indebtedness” of such governmental entity. The general rule, supported by the overwhelming weight of authority, is that the debt limitation does not apply to an indebtedness' incurred in the construction of a public building or utility to be paid for wholly out of the revenue and income arising from the use or operation of the particular property for the construction of which the indebtedness was incurred. 6 McQuillin on Municipal Corporations, Section 2389, states the rule as follows: “It has generally been held and the rule is that the debt limitation does' not apply to a debt that is a lien upon specific property and is not chargeable to the general fund. A municipality does not create an indebtedness by obtaining property to be paid for
 
 wholly out of the income of the property.
 
 Thus bonds issued to pay for water works or a light plant
 
 which provide that they shall be paid solely from the income of such works or plant
 
 do not constitute an indebtedness.” (Italics ours.)
 

 This court is in accord with this doctrine. In the case of
 
 Kasch
 
 v.
 
 Miller, Supt. of Public Works,
 
 104 Ohio St., 281, 135 N. E., 813, involving the validity of a proposed issue of conservancy bonds to construct a dam in the Tuscarawas river, where the bonds were to be paid and liquidated solely from the Sale or lease of water power generated by such dam, this court held that the issuance of such bonds did not violate Section
 
 *613
 
 3 of Article VIII, or any other provision of the Constitution; that “where the entire improvement is to be paid for by the issue and sale of bonds in the name of the state, and the principal and interest are to be paid entirely out of the revenues' derived from the improvement or from the sale of the corpus in case of default, a state debt is not thereby incurred within the purview of the state Constitution; nor do the bonds so issued become an obligation or pledge the credit of the state.”
 

 In 1933, the California Toll Bridge Authority issued revenue bonds for the construction of the San Francisco-Oakland Bay Bridge, aggregating over sixty-two million dollars. The plan for payment of bondholders provided for the segregation of the toll revenue derived from the operation of the bridge, into a special fund to which the bondholders were to look exclusively for payment. The Supreme Court of California in the case of
 
 California Toll Bridge Authority
 
 v.
 
 Kelly, Dir.,
 
 218 Cal., 7, 21 P. (2d), 425, held that the issuance of “such revenue bonds” and the creation of such “special fund” for their payment did not create and would not be a debt or general obligation of the state, and did not amount to a violation of the provision of the state Constitution prohibiting the creation of debts or liabilities in excess of $300,000, without submission of the proposal to the vote of the people. To' the same effect are the following cases:
 
 Bankhead
 
 v.
 
 Town of Sulligent,
 
 229 Ala., 45, 155 So., 869;
 
 State, ex rel. Smith,
 
 v.
 
 City of Neosho,
 
 203 Mo., 40, 101 S. W., 99;
 
 Bell
 
 v.
 
 City of Fayette,
 
 325 Mo., 75, 28 S. W. (2d), 356;
 
 Texas National Guard Armory Board
 
 v.
 
 McCraw, Atty. Genl.
 
 (Tex.), 126 S. W. (2d), 627;
 
 Oppenheim
 
 v.
 
 City of Florence,
 
 229 Ala., 50, 155 So., 859;
 
 State, ex rel. City of Hannibal,
 
 v.
 
 Smith, Aud.,
 
 335 Mo., 825, 74 S. W. (2d), 367;
 
 Schnell
 
 v.
 
 City of Rock Island,
 
 232 Ill., 89, 83 N. E., 462, 14 L. R. A. (N. S.), 874;
 
 Winston
 
 v.
 
 City of Spokane,
 
 12 Wash., 524, 41 P., 888;
 
 Young
 
 v.
 
 City of Ann Arbor, 267
 
 Mich., 241, 255 N. W., 579;
 
 *614
 

 Block
 
 v.
 
 City of Charlevoix,
 
 267 Mich., 255, 255 N. W., 579;
 
 Bates
 
 v.
 
 State Bridge Commission,
 
 109 W. Va., 186, 153 S. E., 305;
 
 Alabama State Bridge Corp.
 
 v.
 
 Smith,
 
 217 Ala., 311, 116 So., 695;
 
 Franklin Trust Co.
 
 v.
 
 City of Loveland,
 
 3 F. (2d), 114;
 
 Shields
 
 v.
 
 City of Loveland,
 
 74 Colo., 27, 218 P., 913;
 
 Fox
 
 v.
 
 City of Bicknell,
 
 193 Ind., 537, 141 N. E., 222;
 
 Barnes
 
 v.
 
 Lehi City,
 
 74 Utah, 321, 279 P., 878;
 
 State, ex rel. Morgan, Atty. Genl.,
 
 v.
 
 City of Portage,
 
 174 Wis., 588, 184 N. W., 376.
 

 In this connection it may be noted that a state or city may voluntarily, but not as a matter of obligation, make contributions from general revenue sources to' the liquidation of revenue bonds payable solely from the income arising from the operation of the enterprise built or purchased from the proceeds of such bonds, and such contributions do not invalidate the issue of such bonds because of debt limitations where they are made from existing or presently available revenues.
 
 California Toll Bridge Authority
 
 v.
 
 Kelly, Dir., supra; Bankhead
 
 v.
 
 Town of Sulligent, supra.
 

 In the case at bar, the bonds are the direct and absolute debt and obligation of the Public Institutional Building Authority, not only because of the form of the obligation, but because the act declares the bonds to be negotiable instruments under the law merchant, in which event.they must be construed as unconditional promises to pay. Moreover, the indication as to the source of funds or lien for payment does not limit the obligation to the receipts from such source. Likewise, the obligation of the Department of Public Welfare of the state of Ohio under its contract with the authority to pay as rental for the state property turned over to the authority the sum of $421,500 per annum for twenty-five years, plus other expense of the authority, is an absolute and outright obligation of the department, an arm of the state, on account of such bonds. In addition the department obligates itself to liquidate the
 
 *615
 
 indebtedness to tbe authority by pledging “all and every part of its available sources of income” and “to fix the amount or amounts to be charged and collected for the support of patients and inmates of the hospitals under [its] control * * * as permitted and provided by Section 2332-3a of the General Code, so as to be sufficient in the aggregate to provide available funds to pay the maintenance costs of said buildings as aforesaid and to pay the Public Institutional Building Authority the sums” promised to it as above stated. Substantially the only sources of revenue for the budget of the Department of Welfare are the payments for the support of patients or inmates of its institutions by the counties which commit the patients to.such institutions or from the inmates thems'elves or those responsible for their support, and the general revenues of the state, provided by taxation. All such funds are first paid into the state treasury and together with the necessary general revenues are appropriated for the use of the department by the General Assembly. (See Sections 1815-1 to 1815-12, inclusive, Section 1864 and Section 1890-46, General Code.) . The revenues arising from pay-patients housed in the ten hospitals and department buildings involved are not segregated into a special fund but are treated as, and in fact become, revenues of the state, subject to appropriation.
 

 The rental contract between the authority and the welfare department calls for the expenditure of the proceeds of the bonds in the construction of additional buildings at some of the already state constructed and owned hospitals, and additions and repairs to others, but no new or independent hospital or institution is contemplated or provided. While certain of the rentals are being turned over by the welfare department to the authority for the use of these buildings and equipment, both old and new, depreciation and obsolescence in them will occur over the twenty-five years; this also applies to the state buildings and equipment already
 
 *616
 
 owned and operated by the state. Furthermore, to the extent that the income from the use of these buildings is diverted to the payment of rental to the authority for the purpose of servicing these bonds, the general revenues from taxation to support these institutions must necessarily be increased to the same extent. The income from the institutions ought to be increased, by reason of the new structures, but there will also be greater expense in administration and upkeep.
 

 Under these circumstances will the state by this proposed contract be obligated in debt beyond the constitutional limitation? By the great weight of authority, bonds issued by a state or municipality, with the proceeds of which some addition is to be constructed or added to public property, which bonds by agreement are to be liquidated solely and exclusively from the revenues of the entire property, old as well as new, constitute a debt or an indebtedness of the state or municipality as the case may be.
 
 Garrett
 
 v.
 
 Swanton, Mayor,
 
 216 Cal., 220, 13 P. (2d), 725;
 
 Schnell
 
 v.
 
 City of Rock Island,
 
 232 Ill., 89, 83 N. E., 462, 14 L. R. A. (N. S.), 874;
 
 Hight
 
 v.
 
 City of Harrisonville,
 
 328 Mo., 549, 41 S.
 
 W.
 
 (2d), 155;
 
 Hagler
 
 v.
 
 City of Salem,
 
 333 Mo., 330, 62 S. W. (2d), 751;
 
 In re Opinions of Justices,
 
 226 Ala., 570, 148 So., 111;
 
 City of Campbell
 
 v.
 
 Arkansas-Missouri Power Co.,
 
 55 F. (2d), 560;
 
 Reimer
 
 v.
 
 Town of Holyoke,
 
 93 Colo., 571, 27 P. (2d), 1032;
 
 Morton
 
 v.
 
 City of Waycross,
 
 173 Ga., 298, 160 S. E., 330;
 
 Miller
 
 v.
 
 City of Buhl,
 
 48 Idaho, 668, 284 P., 843, 72 A. L. R., 682;
 
 Zachary
 
 v.
 
 City of Wagoner,
 
 146 Okla., 268, 292 P., 345;
 
 City of Tecumseh
 
 v.
 
 Butler,
 
 148 Okla., 151, 298 P., 256;
 
 Hesse
 
 v.
 
 City of Watertown,
 
 57 S. D., 325, 232 N. W., 53;
 
 Fjeldsted
 
 v.
 
 Ogden City,
 
 83 Utah, 278, 28 P. (2d), 144;
 
 Earles
 
 v.
 
 Wells,
 
 94 Wis., 285, 68 N. W., 964;
 
 State, ex rel. Board of University & School Lands,
 
 v.
 
 McMillan, Treas.,
 
 12 N. D., 280;
 
 Voss
 
 v.
 
 Waterloo Water Co.,
 
 163 Ind., 69, 71 N. E., 208, 66 L. R. A., 95;
 
 City of Joliet
 
 v.
 
 Alexander,
 
 
 *617
 
 194 Ill., 457, 62 N. E., 861;
 
 City of Ottumwa
 
 v.
 
 City Water Supply Co.,
 
 119 F., 315, 59 L. R. A., 604;
 
 Opinion to the Governor,
 
 54 R. I., 45, 169 A., 748.
 

 This court had before it a similar situation'in the case of
 
 Village of Brewster
 
 v.
 
 Hill,
 
 128 Ohio St., 343, 190 N. E., 766, although the effect of Section 6, Article VIII of the Constitution, was then under consideration. The village of Brewster owning a distribution system for electric current, contracted to purchase generating machinery for its system, payable partly in cash and partly in deferred installments from the net revenues derived from the plant’s operation. The purchase-price installments were not to be the general obligation of the village or payable from taxes. The village agreed to provide housing for the machinery, to pay the cash installment upon the arrival of the equipment and to pay the deferred installments out of the net revenues in sixty consecutive installments. The court held that this transaction between the village and the seller of the machinery contemplated the union of the property of the village with that of the seller in a common pool, from which the net earnings of the joint enterprise would be paid to the seller; and to the extent that the village devoted the whole of its own property to pay the debt to the seller, to that extent did it loan its financial credit to and in aid of the seller in violation of Section 6, Article VIII of the Constitution. By the same token, when it loaned its financial credit, it made itself indebted to the seller. We hold that if the bonds in this case are issued as contemplated, the state not only lends its credit by the contribution of its property
 
 in esse
 
 but becomes indirectly indebted on account of these bonds.
 

 - Some authorities' hold that an obligation of a governmental unit to fix fees and rates so ás to provide funds sufficient to service or liquidate revenue bonds issued to construct some public enterprise is an obligation or debt of the governmental unit.
 
 Fiel
 
 v.
 
 City
 
 
 *618
 

 of Coeur D’Alene,
 
 23 Idaho, 32, 129 P., 643, 43 L. R. A. (N. S.), 1095;
 
 Miller
 
 v.
 
 Buhl,
 
 48 Idaho, 668, 284 P., 843, 72 A. L. R., 682; and
 
 Rodman
 
 v.
 
 Munson,
 
 73 Barb. (N. Y.), 63. But the weight of authority is to the contrary.
 
 Department of Water and Power of Los Angeles
 
 v.
 
 Roman,
 
 218 Cal., 206, 22 P. (2d), 698;
 
 Shelter
 
 v.
 
 Los Angeles,
 
 206 Cal., 544, 275 P., 421;
 
 Shields
 
 v.
 
 Loveland,
 
 74 Colo., 27, 218 P., 913;
 
 Winston
 
 v.
 
 Spokane,
 
 12 Wash., 524, 41 P., 888;
 
 Barns
 
 v.
 
 Lee,
 
 72 Utah, 321, 279 P., 878;
 
 Bowling Green
 
 v.
 
 Kirby,
 
 220 Ky., 839, 295 S. W., 1004;
 
 McClaw
 
 v.
 
 University,
 
 124 Ore., 629, 265 P., 412.
 

 It must be conceded that the hospital properties involved are owned by the state. They have been built, maintained and operated by the public funds arising from taxation. The Department of Public Welfare is the state agency through which they are so maintained and operated. The authority of the department to deal with these properties belonging to the state, as contemplated by the legislation under consideration, is granted by the state through this and other authoritative legislation. The department must still be the agency of the state so far as the state acts with respect to such properties under this program.
 

 When, as contemplated by this legislation, the state turns over to the authority, as lessee, so much of these properties as the latter may select for a period of twenty-five years in consideration of the additions to be constructed by the authority from the proceeds of the bonds which the authority proposes to issue, and in turn the department is made the sub-lessee of the properties to carry on the responsibility of the state in caring for its wards, and in this connection enters into an absolute and unconditional obligation to pay the authority, not the profits or some other contingent sum arising from the operation of the hospitals but a definite and specific sum annually to service the bonds and thus ultimately redeem the properties of the state,
 
 *619
 

 the
 
 department is still acting as the agent of the state and it seems to inescapably follow that its debt to the authority is the debt of the state. The fact that the department hopes to receive compensation for the support of the wards of the state with which to pay such obligation does not change the legal aspect because such fees are at all times public funds of the state. The simple fact is that the debt of the department incurred for the benefit of the state must be the debt of the state.
 

 A default on the bonds of the authority, or on the promise of the welfare department to service such bonds through rentals for its use of the hospital properties, may never occur. But in determining the validity or constitutionality of any legislation, the court must consider what may or might happen under the legislative grant of power.
 

 As we see it, a default is not beyond the realm of possibility. Such eventuality was in the mind of the General Assembly in the enactment of Section 2332-8, General Code, and in the mind of the authority in providing elaborate provisions for such contingency in its resolution authorizing the bonds. The Department of Public Welfare is dependent for its resources upon legislation to provide the revenues from pay-patients in its hospitals or otherwise and to turn such revenues over to its use. These are public funds, at all times subject to legislative control. That this is true is shown by the legislation now under consideration which assumes to divert a portion of such funds to the servicing of these bonds.
 

 A future general assembly may revoke this grant and divert these funds to other purposes. Nothing but a constitutional inhibition could prevent such action. No general ass'embly can guarantee the continuity of its legislation or tie the hands of its successors. Who knows what demands for public revenues and public funds may be more pressing within the next quarter-
 
 *620
 
 century? Who knows the necessities of future general assemblies, finding the public revenues permanently pledged by their predecessors for the servicing of similar bonds, as to which there is no limit and no constitutional limitation under the claim of the relator? In the case of
 
 State, ex rel. Fletcher, Atty. Genl.,
 
 v.
 
 Executive Council,
 
 207 Iowa, 923, 223 N. W., 737, the court had under consideration a legislative enactment which assumed to make the legislation providing for the servicing of similar revenue bonds irrevocable until the bonds were liquidated. The court in the course of its opinion says: “In the absence of any constitutional provision to such effect, no general assembly has power to render its enactment irrevocable and unrepealable by a future general assembly. No general assembly can guarantee the span of life of its legislation beyond the period of its biennium. The power and responsibility of legislation are always upon the existing general assembly. Ohe general assembly may not lay its mandate upon a future one. Only the Constitution can do that. It speaks as an oracle, and stands as a monitor over every general assembly. The funds resulting from license fees and gasoline taxes are within the legislative power, and are necessarily subject to the control of the existing general assembly. Its enactment in relation thereto will continue in force until repealed. The power of a subsequent general assembly either to acquiesce or to repeal is always existent.”
 

 Counsel for the relator claim in their brief that, “A rental agreement having been entered into in this case between the authority and the Department of Public Welfare, such rental agreement would be just as binding upon the receiver as it is upon the authority. Consequently, the receiver would have no right except to allow the use of such buildings for the purposes of the Department of Public Welfare and to collect the rents in accordance with the rental agreement.” The court cannot concur in this view as to what would hap
 
 *621
 
 pen in case of default upon the part of the Department of Public "Welfare in the payment of rentals to the authority.
 

 Section 2332-8, General Code, generously gives to bondholders, -without limitation, all such rights or remedies as aré granted by the resolution of the authority authorizing the issue of the bonds, and in addition gives such bondholders ■ the remedies provided in the statute. Upon default of the authority on the bonds, bondholders may appoint a trustee who may by mandamus enforce the rights of bondholders “including the right to require the authority to collect rates, rentals, and other charges adequate to carry out any agreement as to pledge of the revenues or receipts of the authority, and to require the authority to carry out any other agreements with
 
 or for the benefit of the bondholders and to perform its and their duties under this act.”
 
 (Italics ours.) Who shall be respondents in such mandamus action? Must it be the authority alone which is empty handed except as it may be able to enforce its contract for rentals against the welfare department? We are of opinion that in giving effect to the words of the statute providing that the authoriy may be compelled to carry out any contract “for the benefit of the bondholders,” the court would not be limited to the granting of an ineffectual order against the authority, but could issue its writ against the" welfare department itself, the real source of relief. Under such circumstances the state would necessarily be involved.
 

 The relation of the authority to the hospital properties proposed to be selected and taken over by it, including buildings and properties already owned by the state, is that of a complete and exclusive leasehold or estate for twenty-five years with a sub-letting in turn to the welfare department for the care of its wards. The statute, Section 2332-4,- General Code, gives the authority power “to permit the use of any building
 
 *622
 
 * * * constructed or improved by tbe authority, by the state department for the use of which the same has been constructed or improved, while the authority shall retain title thereto.” There is no retention of possession provided, or requirement that these buildings and properties
 
 shall he
 
 placed in the possession of the welfare department permanently or for the full term of twenty-five years. The contract with the Department of Public Welfare grants permission to the department to use and occupy such buildings over a period of twenty-five years, and “in consideration of such right of use and occupancy the Department of Public Welfare hereby agrees, throughout the period aforesaid,” to pay the authority the annual rental provided, and its other expenses. Under this contract, like any other tenant, the department could not claim the continued right of possession in the event of default in the payment of the rentals. In case of such default to pay rentals by the welfare department, there would likewise occur a default on the bonds of the authority since such rentals would be its only source of revenue.
 

 Under the statute, a trustee upon such default is “entitled as of right to the appointment of a receiver who may * * * enter and take possession of any lands and buildings of which the authority may have possession, * * * the revenues, rentals or receipts
 
 * * *
 
 and operate and maintain the same and collect and receive
 
 all rentals and other revenues thereafter arising therefrom,
 
 in the same manner as the authority might do.” (Italics ours.)
 

 ■Clearly such receiver would have the same right and powers as receivers generally have and are given by the court as to custody of property for the benefit of creditors in cases of insolvency. Undoubtedly, such receiver, representing the creditor bondholders, would be authorized to operate the property independently and exclusively, and would not be obliged to deal with
 
 *623
 
 the defaulting welfare department for the use of the same. In ordinary course, unless, the state in some way came to the rescue to redeem its property, the receiver could bring about a sale of the remainder of the leasehold estate of the authority in these properties, to liquidate the bonds. With these possibilities existent in this scheme of financing, the court holds that the obligation of the welfare department in connection therewith creates an indebtedness on the part of the state and is in contravention of Sections 1 and 3 of Article VIII of the Constitution. The court also holds that Sections
 
 2332-3a,
 
 2332-4 and 2332-5, of the General Code, are unconstitutional and void in so far as they authorize the transfer of income-producing property of the state to the authority, the rentals from which are to service the bonds issued by the authority.
 

 The court is always reluctant to disapprove legislative enactment, especially as in this case, when its purpose is the amelioration of the urgent needs of the state in the care of its wards but, to approve this legislation, in the opinion of the court, would be to open the way to similar schemes of financing upon the part of the state and its municipalities which could not but result, in many instances, in financial disaster.
 

 The demurrer of the respondent to relator’s petition is sustained and the writ is denied.
 

 Writ denied.
 

 Weygandt, C. J., Zimmerman, Williams, Myers and Matthias, JJ., concur.
 

 Day, J., concurs in paragraph one of the syllabus, but dissents from paragraphs two and three of the syllabus and from the judgment.