The State, ex rel. Lynch, *v.* Rhodes et al., Ohio Sinking Fund Commissioners, et al.

(No. 38726—Decided June 16, 1965.)

*Messrs. Saker & Yannon* and *Mr. Theodore R. Saker*, for relator.

*Mr. William B. Saxbe*, attorney general, *Mr. Larry H. Snyder, Messrs. Squire, Sanders & Dempsey, Mr. John Lansdale, Mr. Henry J. Crawford* and *Mr. Richard K. Desmond*, for respondents.

TAFT, C. J.  From the amended petition and answer thereto, it appears without dispute that relator is a citizen and taxpayer of Ohio; that respondents, who are the Governor, the Auditor of State, the Secretary of State, the Treasurer of State and the Attorney General, are the Board of Commissioners of the Sinking Fund; that, on February 14, 1964 and pursuant to an agreement with the Director of Highways, the commissioners sold certificates of obligation, $25 million face value, to Saloman Brothers and Hutzler of New York City for $25,000,627.50 plus accrued interest; and that said certificates bear interest at the rate of 2.17% per annum and become due and payable on June 30, 1965.

The cause has been submitted for determination on relator's demurrer to the answer and on stipulations as to the form of the agreement between the Director of Highways and the commissioners and as to the form of the certificates of obligation.

The litigants agree that the only question presented to the court for determination is whether the foregoing described "certificates of obligation" represent debts of the state within the meaning of Section 3 of Article VIII of the Ohio Constitution which reads:

"Except the debts above specified in Sections 1 and 2 of this article, no debt whatever shall hereafter be created by, or on behalf of the state."

It is conceded that, if those "certificates of obligation" are debts, they cannot come within the exceptions specified in Sections 1 and 2 of Article VIII of the Ohio Constitution.

Any suggestion that these so-called "certificates of obligation" may not be debts of the state, because payable only from revenues accruing from property acquired with their proceeds, should be completely dispelled by the decision of this court in *State, ex rel. Public Institutional Building Authority,* v. *Neffner* (1940), 137 Ohio St. 390, 398, 30 N. E. 2d 705.  See, also, *State, ex rel. Gordon,* v. *Rhodes* (1952), 158 Ohio St. 129, 135, 107 N. E. 2d 206 (syllabus paragraph 3).  The statutes, under which these so-called "certificates of obligation" were issued specifically provide that the obligations of the Director of Highways, to make payments to the Board of Commissioners of the Sinking Fund sometime before June 30, 1965

but not at any specified time before then, shall be a major source of the funds out of which those certificates shall be paid. These payments by the Director of Highways are not limited to the revenues derived from the properties purchased for the Board of Commissioners of the Sinking Fund or even to the value of those properties. Whether the Director needs those properties or not, he is required by the statutes involved in the instant case to buy them so as to provide enough money for the Board of Commissioners of the Sinking Fund to pay not only the principal but also the interest on the so-called "certificates of obligation" involved in the instant case.

These so-called "certificates of obligation" appear on their face to represent a debt of the state. Thus, the beginning of the text of each such certificate, which is set forth in a line and a half above the line that is in very bold type and that states the dollar amount of the particular certificate, reads:

"KNOW ALL MEN BY THESE PRESENTS, that the STATE OF OHIO, by the commissioners of the Sinking Fund, for value received, hereby acknowledges itself indebted and promises to pay to bearer, or, if this certificate is registered as to principal, then to the registered holder hereof, from the fund hereinafter referred to, the sum of * * *."

Since "* * * THE STATE OF OHIO * * * acknowledges itself indebted and promises to pay" the face amount of the certificate, it is difficult to comprehend how it can reasonably be argued that this certificate does not purport to create a debt of the state in that amount.

The balance of the certificate contains 46 lines of small type in two columns which, if carefully read with the statutes referred to therein, might raise some question as to the extent of the obligation of the state. However, the last five of these lines read:

"In witness whereof, the State of Ohio, by the Commissioners of the Sinking Fund under the authority aforesaid, has caused this certificate to be executed by the facsimile signatures of its Governor and its Secretary of State and by the signature of its Treasurer of State and has caused the facsimile of the great seal of the State of Ohio to be hereunto affixed, and has caused the interest coupons hereto attached to be executed

with the facsimile signature of its Treasurer of State all as of the 15th day of February, 1964.''

These latter lines certainly emphasize the involvement of the state in some very serious obligations.

The interest coupons read as follows:

''The State of Ohio will pay to the bearer * * * [a certain amount] from the special highway acquisition fund No. 1, designated in, and as, and for the interest then due on its Certificates of Obligation, * * * John D. Herbert, Treasurer of State of the State of Ohio.''

In contending that these ''certificates of obligation'' are not debts prohibited by the Constitution, respondents rely upon paragraph two of the syllabus of *State, ex rel, Preston, Dir. of Highways,* v. *Ferguson, Treas.* (1960), 170 Ohio St. 450, 166 N. E. 2d 365, which reads:

''Obligations of the state for which revenue has been provided and appropriations made for the payment thereof in the then current biennium are not debts within the meaning of Sections 1, 2c [*sic*] and 3, Article VIII, Ohio Constitution (*State* v. *Medbery*, 7 Ohio St., 522, approved and followed).''

The *Preston* case involved certain statutes first enacted in 1959 (128 Ohio Laws 1130—Sections 3309.151 and 5501.112, Revised Code). These statutes authorized, and the School employees Retirement Board entered into, an agreement with the Director of Highways under which the Director was to purchase as agent for that Board certain real property that he deemed necessary for improvement of the state highway system. The agreement, in accordance with the statutes, required the Director to purchase from and pay the Board for all such real property before the end of the then current biennium out of money already appropriated to the Director and the agreement also required that the money so appropriated be encumbered as provided by Section 131.17, Revised Code. (Although renewals of the agreements for purchase by the Director were authorized, this court emphasized that each renewal would require a new agreement between the Board and the Director for no longer than a biennium and would have to be supported by a valid legislative appropriation for that biennium. Syllabus 4 and page 459 of opinion in *Preston case*).

In 1961 (129 Ohio Laws 548) after the decision of the *Preston* case, the General Assembly enacted the statutes pursuant to which the present so-called "certificates of obligation" were issued. Those statutes rely upon, but also represent a step and a very long step beyond, the statutes construed in the *Preston* case.

There, the School Employees Retirement Board had been authorized to invest their public pension and retirement funds in the real estate which the Highway Director purchased for them under an agreement of the Highway Director to repay with interest the amount invested out of money appropriated to the Director for the then current biennium.

The statutes involved in the instant case provide for similar investments by the Board of Commissioners of the Sinking Fund. However they go further and purport to enable the Board of Commissioners of the Sinking Fund to raise funds for those investments by selling certificates of obligation to the public. In doing so, they begin by stating (Section 129.41, Revised Code) :

"The commissioners of the Sinking Fund, created by Section 8 of Article VIII, Ohio Constitution, may provide by resolution for the issuance of certificates of obligation of the state * * *."

We ordinarily think of an obligation to pay a certain amount as an indebtedness for that amount or a debt. Hence, we would ordinarily think of an "obligation of the state" as a debt of the state.

If we turn to the referred to Section 8 of Article VIII of the Constitution we find that it only creates the Commissioners of the Sinking Fund. However, if we glance at the constitutional sections above and below Section 8, we get the definite idea that those commissioners as such are to deal only with the debts of the state.

Thus, Section 7 states in part:

"The faith of the state being pledged for the payment of its public debts, in order to provide therefor, there shall be created a sinking fund * * * to pay * * * interest on such debt, and * * * reduce the principal thereof * * *."

Also, Section 10 states in part:

"It shall be the duty of the said commissioners faithfully to apply said fund, together with all monies that may be, by the General Assembly, appropriated to that object, to the payment of the interest * * * and * * * principal of the public debt of the state * * *."

It is quite apparent therefore that not only the certificates of obligation here involved but also the statutes under which they were issued purport to create a debt of the state.

Furthermore, there are statements in the opinion in the *Preston case*[1] and in the syllabus[2] and opinion[3] in the *Medbery case* that indicate a lack of power in a General Assembly to make appropriations for payments after the two-year term of office of such General Assembly.[4] On the other hand, the decision and some statements in the opinion in the *Preston case* seem to recognize the power of a General Assembly to make appropriations for a biennium extending beyond the two-year term

---

[1] Page 455 "* * * the keystone of our whole system of finance and expenditure is the constitutional provision prohibiting the legislature from making any appropriation of funds for a period exceeding two years. * * * The reasons for its significance were well stated by Judge Swan * * *:

'1. The General Assembly at each biennial session determine the amount of the expenditure for the two years of their official term, in all cases not otherwise predetermined by the * * * Constitution;

'2. They must take the responsibility of making the necessary appropriations for this purpose, otherwise no money can be paid;

'3. They must assess a tax upon their constituency sufficient in amount to meet the appropriations.

'* * * each member is thus compelled, during his official term, to visit upon his constituents the pecuniary consequences of his sanction of liabilities to be incurred and of appropriations made. * * * wasteful expenditures, instead of being concealed or mitigated by delay of payment or the creation of debts, must be immediately made known * * * through the demands of the tax gatherer for the money.' "

Page 456 "* * * the General Assembly * * * could not appropriate beyond its two year life * * *."

[2] * * * the power and the discretion, intact, to make appropriations in general devolving on each biennial General Assembly, and for the period of two years."

[3] "* * * each General Assembly is required to provide revenue and make appropriations for the period of two years, leaving no debt or liability behind * * *."

[4] See *State, ex rel. Public Institutional Building Authority*, v. *Griffith* (1939), 135 Ohio St. 604, 619, 620, 22 N. E. 2d 200.

of such General Assembly. Although the power of a General Assembly tò make appropriations for any time beyond its two-year term was not raised or considered in the *Preston case*,[5] this precise problem was discussed by Williams, J. in the opinion in *State, ex rel. Youngstown,* v. *Jones, Aud.* (1939), 136 Ohio St. 130, 24 N. E. 2d 442, where he stated at pages 133 and 134:

"Since the biennium, for which the members of the 92nd General Assembly were elected, ended on the last day of December, 1938, the appropriation, if such it were, was made from funds to be collected after the close of the biennium. It is therefore necessary to inquire into the extent of the law-making power of that body.

"The state Constitution is a limitation on power as distinguished from a grant of power and, since the state and federal Constitutions operate as restrictions on the law-making power of the legislative branch of state government, the General Assembly may pass any legislation not inhibited by the organic law of the state or nation.

"The only limitation on the power of the General Assembly as to appropriations is found in Section 22, Article II of the state Constitution:

" 'No money shall be drawn from the treasury, except in pursuance of a specific appropriation, made by law; and no appropriation shall be made for a longer period than two years.' * * * The language employed in the Constitution, in .our judgment, merely limits the time for and during which an appropriation may be made to two years from the time legislative action was taken with reference thereto. At the end of this two-year period, the appropriation lapses, but the constitutional provision does not prohibit the appropriation of excise revenues collected after the General Assembly making the appropriation has ceased to exist through the expiration of its biennium, pro-

---

[5]In *State, ex rel. Gordon,* v. *Rhodes* (1952), 158 Ohio St. 129, 107 N. E. 2d 206, paragraph 1 of the syllabus reads:

"A reported decision, although in a case where the question might have been raised, is entitled to no consideration whatever as settling, by judicial determination, a question not passed upon or raised at the time of the adjudication."

viding the excise taxes have been previously or contemporaneously laid and imposed by valid enactment, and the appropriation sets apart revenues collected within two years after the appropriation is made.'"[6]

In the instant case, the appropriation relied upon by respondents was made by an act of the 105th General Assembly[7] which became effective on April 26, 1963.[8] The term of that General Assembly ended on December 31, 1964. The "certificates of obligation" involved in the instant case are not due and payable until June 30, 1965. That date is more than two years after the date of appropriation made for that payment. The 105th General Assembly had no power to make an appropriation for a payment at a time not only beyond its term but more than two years after its enactment of legislation providing for such appropriation. It necessarily follows that, as held in the *Medbery case* and indicated by the *Preston case*, these "certificates of obligations," without any valid appropriation for

---

[6]It may be noted that no question was raised in the foregoing case as to whether there was a debt, probably because the borrowing there involved was by the county which, although an arm of the State, is not subject to the debt limitations of Article VIII of the Constitution. See *Cass* v. *Dillon* (1853), 2 Ohio St. 607, 613-616.

It may be that an appropriation by a General Assembly for a payment after its two-year term of office would be valid, especially if not repealed by the next General Assembly before the payment was made. However, because of the right of the next General Assembly to change the law, it is reasonably arguable that an appropriation by a General Assembly for payment of a state obligation that is due within two years of the appropriation but after the two-year term of office of that General Assembly would not prevent such obligation from being a debt of the state, even though such appropriation was not repealed by the subsequent General Assembly.

[7]Section 2 of amended House Bill 291 as set forth in supplement to 130 Ohio Laws 7.

[8]Supplement to 130 Ohio Laws 7 so states at Page 19. Article II, Section 1d of the Ohio Constitution provides that "laws providing for * * * appropriations for the current expenses of the state government * * * shall go into immediate effect." "Current expenses of the state government" certainly include what must, as must the certificates of obligation in the instant case if they have any chance of not being a debt, be paid, to use the words of paragraph 2 of the syllabus of the *Preston case* "in the then current biennium."

their payment, represent a debt prohibited by Article VIII of the Constitution of Ohio.

It may be noted that, in the *Preston case*, the appropriation relied upon was made by an act of the 103rd General Assembly (Am. Sub. H. B. 831) which became effective on June 30, 1959, and the obligations therein involved were to be paid out of that appropriation within two years after that date.

This case was argued on April 26. On May 27, the Board of Commissioners of the Sinking Fund filed a motion for an order to show cause why the question in the instant case was not moot. In the brief in support of that motion, it is stated that all obligations of the Director of Highways to the Commissioners of the Sinking Fund have now been discharged and that the Commissioners of the Sinking Fund now have in their possession funds more than sufficient to pay off all certificates of obligation with interest when they become due on June 30, 1965.

In reaching our conclusion, we have not found it necessary to consider whether the obligations of the Director of Highways to the Commissioners of the Sinking Fund were prohibited by the Constitution. Our conclusion is that the issuance and sale of the certificates of obligation by the Sinking Fund Commissioners purported to create a debt of the State prohibited by the Constitution. The fact that the State has enough money to pay the principal and interest called for by such certificates does not change our conclusion that the Constitution prohibited the creation of the debt which those certificates purported to create. Hence, the motion for an order to show cause is denied.

Although no such question has been raised by the litigants, it has been suggested by some members of this court that there is no mandatory duty on respondents and therefore this action in mandamus should be dismissed.

Obviously, some of the relief prayed for in the amended petition cannot be granted. However, relator does ask for a writ "commanding * * * return to Saloman Brothers and Hutzler the funds on hand and unexpended of the amount generated by the sale to them of the * * * certificates * * *."

Over $25 million was paid to the Sinking Fund Commissioners for the "certificates of obligation" involved in the in-

stant case. This money was paid on the assumption that there would be an obligation of the state or its Sinking Fund Commissioners to pay to the holders of those certificates their face amount plus the interest specified.

It was stipulated at the hearing before this court that a substantial amount of the money paid for the certificates is still in the fund under the control of the commissioners. Since these "certificates of obligation" create a debt of the state that is prohibited by the Constitution, it is apparent that the Sinking Fund Commissioners have acquired the monies paid for the certificates without giving any obligation therefor, and have a mandatory obligation and duty to return any portion of such monies now in their possession. *Parkersburg* v. *Brown* (1882), 106 U. S. 487, 27 L. Ed. 238, *Logan County Natl. Bank* v. *Townsend* (1891), 139 U. S. 107, 35 L. Ed. 107, *Grand Island* v. *Willis* (1943), 142 Neb. 686, 7 N. W. 2d 457. See *State, ex rel. Marble Cliff Quarries Co.,* v. *Morse* (1951), 154 Ohio St. 459, 96 N. E. (2d) 297. However, since the "certificates of obligation" constitute a prohibited debt of the state, the payment of interest on such debt would be unlawful. Hence, the amount repaid should not exceed the $25,000,627.50 so obtained less the amount of interest heretofore paid on the coupons attached to the "certificates of obligation." Accordingly, a writ so ordering should be allowed.

ZIMMERMAN, MATTHIAS and O'NEILL, JJ., concur in the foregoing opinion.

O'NEILL, J. This is a simple case. It is agreed that the Commissioners of the Sinking Fund, who are the Governor, the Attorney General, the Auditor of State, the Treasurer of State and the Secretary of State, issued on February 14, 1964, 228 certificates of obligation,[1] having a gross face value of $25,000,000,

---

[1]The issuance of these certificates was not authorized by any amendment to the Constitution approved by vote of the people, providing for the issuance of bonds, notes or certificates. See: Section 2b, Article VIII, adopted November 4, 1947; Section 2c, Article VIII, adopted November 3, 1953; Section 2d, Article VIII, adopted November 6, 1956; Section 2e, Article VIII, adopted November 8, 1955; Section 2f, Article VIII, adopted November 5, 1963; Section 2g, Article VIII, adopted May 5, 1964.

and the Treasurer of State delivered these certificates to Saloman Brothers and Hutzler of New York City and received the net sum of $25,000,627.50. Such certificates bear interest at 2.17%, payable June 30, 1964, December 31, 1964 and June 30, 1965, on which last date the principal is to be paid.

The pertinent language of each of these certificates reads as follows:

"State of Ohio Certificate of Obligation * * *. The State of Ohio, by the Commissioners of the Sinking Fund, for value received, hereby acknowledges itself *indebted* and *promises to pay to bearer*, or * * * the *registered holder* * * * the sum of [each certificate contained an amount of $100,000 or a multiple thereof] on the 30th day of June, 1965 and to pay * * * interest on said sum from the date hereof at the rate of two and seventeen-one hundredths per centum * * *.

"This certificate is one of a series of certificates in the aggregate principal sum of $25,000,000 issued by the State of Ohio, acting by and through the Commissioners of the Sinking Fund * * *.

"This certificate is fully negotiable * * *.

"In witness whereof, the State of Ohio, by the Commissioners of the Sinking Fund under the authority aforesaid, has caused this certificate to be executed by the facsimile signatures of its Governor and its Secretary of State and by the signature of its Treasurer of State and has caused the facsimile of the Great Seal of the State of Ohio to be hereunto affixed, and has caused the interest coupons hereto attached to be executed with the facsimile signature of its Treasurer of State * * *." (Emphasis added.)

Incredible as it might seem, the respondents in this case assert that the *borrowing of this amount of money* from this investment house did not create a debt of the State of Ohio prohibited by Article VIII of the Constitution of the State of Ohio.

This is the question to be decided by this court. Did the borrowing of the money [$25,000,000] and the delivery of the certificates bearing the promise to pay the principal with interest create a debt of the State of Ohio?

The principal and interest is to be repaid from tax monies

allocated to the Highway Department and appropriated by the Legislature for that purpose.

Section 1, Article VIII of the Constitution reads as follows:

"The State may contract debts [borrow money], to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more acts of the General Assembly, or at different periods of time, shall *never* exceed seven hundred and fifty thousand dollars; and the money, arising from the creation of such debts, shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever." (Emphasis added.)

The respondents rely entirely upon *State* v. *Medbery*, 7 Ohio St. 522, and *State, ex rel. Preston, Dir.,* v. *Ferguson, Treas.,* 170 Ohio St. 450.

Judge Swan, in *State* v. *Medbery, supra,* recognized the distinction between *borrowing money* and claims against the state arising from agreements entered into by the state for services to be performed or materials and labor to be furnished [Medbery dealt with this latter kind of agreement] when he said at page 534:

"* * * Admitting, then, that the whole of the first section, [of Article VIII], from the fact that it declares that the money arising from the creation of 'such debts shall be applied for the purpose for which it was obtained,' relates to debts for borrowed money only, it is manifest, that the general and sweeping inhibition of the third section does not deal with any particular class of debts; nor with the consideration of debts, whether they arise from services, borrowed money, or otherwise; nor simply with the particular class of debts mentioned in the first and second sections, but prohibits any debt whatever."

A reading of his entire opinion indicates that he treated the contract for the repair of public works involved in that case as an agreement to perform services and furnish materials and labor for such repair work. He held that such an agreement created a contingent liability to pay for such services and the furnishing of such materials and labor when the services had

been performed and the materials and labor had been furnished. He stated that the contingency in this obligation was not resolved until the services were performed or the materials and labor furnished but that once this was done, the contingency was removed and the state was obligated to pay.

Judge Swan correctly stated that in the normal functions of state government there would be an appropriation and certification that the money was available and as soon as the contingency was met and the obligation accrued, payment would be made as soon as the mechanics of payment could be performed.

Judge Swan stated, at page 530:

"* * * Such financial transactions are not therefore to be deemed debts."

That is not this case. There was no borrowing of money in *Medbery*.

However, he held that where such services were to be performed or materials and labor furnished during a period of years which extended beyond the biennium in which the agreement was entered into and thus beyond the term of office of the then members of the General Assembly and thus beyond the time for which that General Assembly had power to make appropriations, that even though that liability was contingent and would not accrue until the services were performed or the materials and labor were furnished, such a contingent liability was a debt and prohibited by the Constitution of Ohio.

It might be argued in the instant case that the agreement between the Department of Highways and the Commissioners of the Sinking Fund is an agreement similar to the agreement in the case of *State, ex rel. Preston, Dir.,* v. *Ferguson, Treas., supra,* and that there is only contingent liability upon the Director of Highways which does not accrue until the Commissioners of the Sinking Fund deliver the deeds for the parcels of real estate to the Director of Highways, at which time he delivers payment for those parcels of real estate. Thus, there is no accrued obligation which is a debt prohibited by Section 3, Article VIII of the Ohio Constitution.

It can not be contended, however, that there was anything contingent about the exchange between the Saloman invest-

ment company and the Treasurer of the State of Ohio of $25,000,000 for a written promise to repay the principal with interest. That obligation accrued upon that exchange and no matter what happened thereafter, by the terms of that contract of debt, the State of Ohio was required to repay the principal sum with interest thereon.

Such a borrowing of money is expressly prohibited by Section 1, Article VIII of the Constitution of Ohio and such certificates of obligation are invalid.

I have already indicated how *Medbery, supra,* is distinguished from the instant case and pointed out that it expressly did not deal with the question before this court.

Likewise, the *Preston case, supra,* dealt with an agreement between the School Employees Retirement Board and the Department of Highways, whereby the School Employees Retirement Board invested its funds in parcels of real estate and took title thereto. The Director of Highways, pursuant to this agreement, then purchased these parcels of real estate and took title to them in the name of the State of Ohio and paid the Retirement Board for them from appropriations made by the Legislature from tax funds allocated to the Department of Highways.

The *Preston case, supra,* treated this under the reasoning of *Medbery, supra,* as a contingent liability which did not accrue until the Highway Director received title to the parcels of real estate. The Retirement Board, upon executing and delivering the deeds, would receive payment for said parcels. Thus, at the time the contingency was resolved and the debt accrued, the payment was immediate.

That is not this case.

This theory of reasoning may be applicable to the agreement between the Commissioners of the Sinking Fund and the Highway Department in this case, but it clearly is not applicable to the accrued debt incurred by the borrowing of $25,000,000 by the Commissioners of the Sinking Fund from a private investment house. It is not even contended, and could not be, by respondents that this was a contingent obligation, or a contingent liability.

It is obvious from the actions taken by the Treasurer of State and the representatives of the investment house, and from the terms of the certificates, and from the delivery of the $25,000,000 in exchange for the certificates, that a debt accrued on February 17, 1964. The payment of interest was required upon the principal of that debt in three installments and the repayment of the principal and interest was required upon a date certain.

The certificates are invalid because their issue was prohibited by Section 1, Article VIII of the Constitution and the money in a sum not to exceed $25,000,627.50 should be returned, less whatever interest has been paid, because interest can not be paid upon a debt which is prohibited by the Constitution.

The writ under those terms should be allowed.[2]

TAFT, C. J., ZIMMERMAN and MATTHIAS, JJ., concur in the foregoing opinion.

HERBERT, J. An examination of the record in this cause reveals that relator has presented one question for this court's determination: whether the certificates of obligations represent debts of the state of Ohio within the meaning of Section 3 of Article VIII of the Ohio Constitution.

The certificates of obligation resulted from an agreement entered into between the Director of Highways and the Board of Commissioners of the Sinking Fund, pursuant to the provisions of Section 5501.115, Revised Code. The agreement recites that the parties to the agreement have determined that a number of parcels of real property throughtout this state will be used as right-of-way for highways planned for construction and that Sections 129.41, 129.42, 5501.115, 5501.116, and 5501.117, Revised Code, provide a procedure to acquire said property and pay the cost of such acquisition.

---

[2]It should be pointed out that a demurrer, on the ground that, a cause of action in mandamus is not stated by the amended petition, was overruled by this court on November 25, 1965.

On the hearing on the merits counsel for the respondents urged the court not to consider that question further and requested that the court decide this cause upon its merits.

The agreement provides that the Commissioners will issue the certificates of obligation and the money realized from their sale will be deposited in a special fund, created pursuant to Section 129.42, Revised Code. The Director of Highways is authorized to act as an agent for the commissioners in the acquisition of the desired property, the purchase price being drawn from the special fund. Upon completion of the purchase, title to said properties is in the commissioners. The Director of Highways is then required to purchase said properties from funds already appropriated to the Department of Highways according to a price schedule set forth in the agreement.

The agreement also states that the Director of Highways acknowledges that the agreement encumbers moneys appropriated to the Department of Highways by the 105th General Assembly and appended to the agreement is a certification by the Director of Finance that there exists in the appropriations made by House Bill No. 291, enacted by the 105th General Assembly, sufficient funds to honor the certificates of obligation created by the agreement and that these funds are not otherwise obligated to pay any preceding obligation. Subject to certain renewal provisions, the agreement is specified to terminate on June 30, 1965. Five days prior to the expiration of the agreement, the Treasurer must notify the Director of Highways of any insufficiency in funds to honor the certificates of obligation and the Director of Highways must immediately pay to the commissioners the amount of the insufficiency in funds.

The agreement, entered into pursuant to the above cited statutes, sets forth a procedure whereby the Director of Highways may purchase right of way property for planned highways prior to the actual construction of the highways. It provides a procedure for obtaining funds for the purchase of these properties and encumbers moneys which have been previously appropriated by the General Assembly to the Director of Highways.

A procedure similar to the one described above, was held constitutional in *State, ex rel. Preston,* v. *Ferguson, Treas.* (1960), 170 Ohio St. 450. Paragraphs one and two of syllabus therein provide as follows:

"1. Section 5501.112, Revised Code, creates a method for financing the cost of the advance acquistion of land to be used for highway purposes and authorizes the Director of Highways to enter into agreements with the School Employees Retirement Board whereby such board is to use its funds to acquire title to property that the Director of Highways 'deems will be necessary for the improvement of the state highway system'; and the board retains such title subject to later purchase by the Department of Highways on behalf of the state.

"2. Obligations of the state for which revenue has been provided and appropriations made for the payment thereof in the then current biennium are not debts within the meaning of Sections 1, 2c and 3, Article VIII, Ohio Constitution. (*State* v. *Medbery*, 7 Ohio St. 522, approved and followed.)"

In *Preston* and here the Director of Highways utilized certain funds generated for the purchase of land. In both cases the Director of Highways entered into an agreement with another political body of the state. And in both cases, the other political body generated funds which the Director of Highways utilized subject to granting an encumbrance against funds already appropriated by the General Assembly to the Department of Highways. Finally, in both cases, the agreements terminated on the last day of the fiscal biennium of the General Assembly that enacted the appropriation; and the appropriation was subjected to an encumbrance by the terms of the agreements.

The single factual difference between *Preston* and the instant case is that in *Preston* the political body that generated the funds already had them within its control. In the instant case, the Commissioners obtained funds from private sources. However, in both cases, the funds generated were not previously under state ownership.

Relator urges that the *Preston* decision rests solely on the fact that the funds utilized were, in effect, already state funds and hence, no debt was created. This conclusion is directly contrary to the opinion and syllabus in *Preston* and is without merit. The *Preston* decision rests on an interpretation of Section 3, Article VIII of the Ohio Constitution, to wit, did the agreement therein create a debt prohibited by that provision

of the Constitution? We are required to make a similar interpretation in this cause.

Relator does not request that we reconsider our holding in *Preston*. Upon analysis of that decision, it is our conclusion that the principles of law contained therein are totally consistent with judicial precedent and are to be approved and followed.

The issue in the instant case is whether a certificate of obligation (in contrast to a contract to pay money) held by parties not connected with the state (in contrast to a body subject to state regulations) creates a debt prohibited by the Constitution.

Because the factual distinctions noted above are irrelevant to the reasoning of the *Preston* decision, we must conclude that no debt was created within the meaning of Section 3, Article VIII of the Ohio Constitution. In both cases private funds were utilized. While the School Retirement System is state regulated, this fact hardly makes the funds deposited therein by school teachers throughout the state, "in effect," state funds. Also, a certificate of obligation which, by its terms, requires the payment of money from an existing appropriation within the fiscal year biennium in which the certificate was created cannot be distinguished from a contract created for that same purpose. Both the contract and the certificates require the payment of funds within the fiscal biennium. As analyzed in *Preston, supra,* this is not a "debt."

Moreover, judicial precedent requires the above conclusion.

The initial point of discussion is found in *State v. Medbery* (1857), 7 Ohio St. 522. Therein the court held that certain contracts creating a present obligation of the state to pay money *five years beyond the biennium for which legislative appropriations could be made, created a debt of the state.*

The second paragraph of the syllabus reads:

"That no officers of the state can enter into any contract, except in cases specified in the Constitution, whereby the General Assembly will, two years after, be bound to make appropriations either for a particular object or a fixed amount —the power and the discretion, intact, to make appropria-

tions in general devolving *on each biennial General Assembly, and for the period of two years."* (Emphasis added.)

In *State, ex rel. Youngstown,* v. *Jones,* 136 Ohio St. 130, this court considered the power of the General Assembly to appropriate funds. The opinion states, at page 134:

"The only limitation on the power of the General Assembly as to appropriations is found in Section 22, Article II of the State Constitution: 'No money shall be drawn from the treasury, except in pursuance of a specific appropriation, made by law; and no appropriation shall be made for a longer period than two years.' * * * The language employed in the Constitution, in our judgment merely limits the time for and during which an appropriation may be made to two years from the time legislative action was taken with reference thereto. At the end of this two-year period, the appropriation lapses, but the constitutional provision does not prohibit the appropriation of excise revenues collected after the General Assembly making the appropriation has ceased to exist through the expiration of its biennium, providing the excise taxes have been previously or contemporaneously laid and imposed by valid enactment, and the appropriation set apart revenues collected within two years after the appropriation is made."

At this point we may note that *Medbery* and *Youngstown* represent unchallenged authorities that each General Assembly controlled its fiscal year; that claims and expenses extinguished within that period were not "debts"; and that claims against appropriations must be presented within two years "from the time legislative action was taken with reference" to the appropriation.

In 1960, this court decided the case of *Preston, supra.*

In *Preston* this court considered the lawfulness of certain agreements entered into, pursuant to Section 5501.112, Revised Code, between the Director of Highways and the School Employees Retirement Board. Matthias, J., speaking for the court, analyzed the import of the *Medbery* decision and cited with approval the following principles of law as contained in *Medbery*: First, where appropriations are made and revenues provided

for a two-year obligation there is "constitutional compliance"; second, a strict interpretation of the term debt cannot be substituted for the fiscal year; and third, claims arising and extinguished in the fiscal year are not debts within the meaning of the Ohio Constitution.

The holding in *Preston* is that the agreements there in question, extending in time for a period of two years and coinciding with the commencement and termination of the then present fiscal year were not a creation of debt and therefore not contrary to the Ohio Constitution. It is expressly stated therein, at page 460, that "an obligation supported by an appropriation but remaining unpaid at the end of a [fiscal] biennium accrues into a debt at such time. * * * it is possible for the new General Assembly, by prompt action, *to pass an appropriation act which will become law before the end of the old [fiscal] biennium.* * * *

"* * * in the event an agreement * * * is entered into after the beginning of a current [fiscal] biennium, such agreement could, in no event, extend beyond the terminal date of that current [fiscal] biennium." (Emphasis added.)

The respondents, in the instant case, have performed exactly as required by the above principles: (1) An appropriation was made at the beginning of a current biennium; (2) the appropriation did not exceed two years duration; (3) the appropriation expressly provided for the payment of any agreements created by the Sinking Fund Commission; (4) the Sinking Fund Commission did in fact enter into an agreement for a specific purpose authorized by the appropriation within the effective period of the appropriation; and (5) the agreements created expressly provided for its termination within the effective period of the appropriation.

We note that the fiscal biennium of the 105th General Assembly extends from July 1, 1963, through June 30, 1965. The fiscal biennium of the 105th General Assembly thus extends six months into the elective term of the 106th General Assembly. The practice of overlapping the fiscal biennium with the elective biennium has been utilized by the General Assembly for over the last dozen years. This appears to be a matter of convenience

in order to provide continuity in fiscal action and a six-month grace period for the incoming General Assembly wherein the proposed fiscal program of the incoming General Assembly may be considered in calm and deliberateness rather than haste.

The appropropriation period under the above system remains for two years in compliance with Section 22, Article II of the Ohio Constitution, and has received tacit approval in *Medbery, Youngstown* and *Preston, supra.* Absent a true litigation of this practice, we do not feel obligated to disturb this approval.

Chief Justice Taft states that the appropriation relied upon by the respondents "was made by an act of the 105th General Assembly (House Bill No. 291) *which became effective on April 26, 1963.*" (Emphasis added.)

In *State, ex rel. Ach,* v. *Evans* (1914), 90 Ohio St. 243, 247, the following statement appears:

"Now, it has always been recognized as a proper exercise of legislative power for the legislature to determine for itself when the act or part thereof shall go into effect."

Therein this court determined that the Legislature could properly provide that a particular act go into effect 120 days after its passage.

In *Machine Co.* v. *Power Co.,* 99 Ohio St. 429, paragraph two of the syllabus, is as follows:

"Where a future time is named in an act when it shall become effective, it will speak and operate only from that time unless a different intention is manifested."

Therein this court approved legislative action which provided that a particular act go into effect 17 days after its passage.

The *Ach* and *Power* decisions must be approved and followed. A more necessary and useful power of the Legislature to determine when an act may go into effect can hardly be envisioned. To hold otherwise would require that the General Assembly schedule its sessions according to the time it desired the act to go into effect. Such a rule would severely affect the efficiency of legislative procedure.

With the above judicial precedents in mind, it becomes necessary to examine House Bill 291. The pertinent provisions of that bill are as follows:

"An Act

"To make appropriations for highway purposes for the biennium *beginning July 1, 1963 and ending June 30, 1965.* (Emphasis added.)

"*Be it enacted by the General Assembly of the State of Ohio:*

"Section 1. There are hereby appropriated out of any moneys in the state treasury to the credit of the funds set forth below and not otherwise appropriated, the sums set forth in this section for the specific highway purposes designated.

"Except as provided in Section 6 of this act [not herein relevant] *sums named in the column designated 1963-1964 shall not be expended to pay liabilities or deficiencies existing prior to July 1, 1963,* nor to pay liabilities incurred subsequent to June 30, 1964; those named in the column designated 1964-1965 shall not be expended to pay liabilities or deficiencies existing prior to July 1, 1964, or incurred subsequent to June 30, 1965. (Emphasis added.)

"* * *

"All unexpended balances of moneys received or accrued in prior years under previous acts appropriating funds to the Department of Highways, or refunds thereto, or other departmental receipts, may be carried forward to subequent appropriation years at the request of the Director of Highways.

"* * *

"Section 2. All moneys accruing to any special highway acquisition fund created in Section 129.42 of the Revised Code are hereby appropriated to the Sinking Fund Commission for the purposes set forth in said section."

It can only be observed that the General Assembly provided, in express language, that the appropriations contained in the above bill were "for the biennium beginning July 1, 1963" and that the appropriations contained therein "shall not be expend-

ed to pay liabilities or deficiencies existing prior to July 1, 1963."[1] Any obligation of the state of Ohio, arising under the certificates of obligation, having been fully satisfied, it appears that the questions raised by the relator are now moot.

For the above reasons the writ of mandamus should be denied.

SCHNEIDER, J., concurs in the foregoing opinion.

BROWN, J. It is clear that the certificates of obligation have already been issued and sold by the Commissioners. Relator's prayer is for a writ commanding and directing the respondent commissioners to revoke and rescind their actions, to return to the purchasers any unexpended funds received from the sale of the certificates and to apply such other highway funds as are under the control of the respondents for the immediate call and retirement of the certificates described.

It is not the function of the writ of mandamus to correct alleged errors made by a public officer. *State, ex rel.*, v. *Crites*, 48 Ohio St. 460; *State, ex rel. Conrad*, v. *Langer*, 68 N. D. 167, 176, 277 N. W. 504; *Kaufman Construction Co.* v. *Holcomb*, 357 Pa. 514, 520, 55 A. 2d 534.

---

[1]Chief Justice Taft, in footnote 8 of his opinion states that House Bill 291 was an "appropriations for the current expenses of the state government." This "possibility," however, is completely abrogated in *State, ex rel. Janes*, v. *Brown* (1925), 112 Ohio St. 590. Paragraph four of the syllabus provides as follows:

"The phrase 'current expenses,' as used in Section 1d of Article II of the Constitution * * * includes the expense of keeping in repair and maintaining the property of the state government and, *as applied to roads, includes the maintaining and repair thereof as distinguished from new construction.*" (Emphasis added.)

In *State, ex rel. Preston*, v. *Ferguson, supra* (170 Ohio St. 450, 454), this court expressly held that purchasing highway rights of way is not such an expenditure as to qualify it as a current expense of government.

Furthermore, the effective date of a bill duly enacted must be considered in light of Sections 1c, 1d, Article II and Section 16, Article II of the Ohio Constitution. See *State* v. *Lathrop*, 93 Ohio St. 79; *State, ex rel. Donahey*, v. *Roose*, 90 Ohio St. 345.

Section 2731.01, Revised Code, provides:

"Mandamus is a writ, issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station."

Since it is apparent that the relator's petition does not seek to command the performance of an act which the law specially enjoins, the writ should be denied.

SCHNEIDER, J., concurs in the forgoing opinion.