[Cite as *E. Liverpool v. Buckeye Water Dist.*, 2012-Ohio-2821.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| THE CITY OF EAST LIVERPOOL | ) | CASE NOS.  11 CO 41 |
| | ) | 11 CO 42 |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| BUCKEYE WATER DISTRICT, et al. | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from the Court of Common
Pleas of Columbiana County, Ohio
Case No. 05-CV-502

JUDGMENT:     Affirmed in part.  Modified and
Remanded in part.

JUDGES:
Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  June 21, 2012

[Cite as *E. Liverpool v. Buckeye Water Dist.*, 2012-Ohio-2821.]
APPEARANCES:

| | |
|---|---|
| For City of East Liverpool: | Atty. Charles L. Payne<br>Law Director – City of East Liverpool<br>617 S. Clair Avenue<br>East Liverpool, Ohio 43920 |
| | Atty. Thomas W. Connors<br>Atty. James M. Wherley, Jr.<br>Black, McCuskey, Souers & Arbaugh<br>220 Market Avenue South, Suite 1000<br>Canton, Ohio 44702 |
| For Buckeye Water District: | Atty. Dennis M. O'Toole<br>Stumphauzer, O'Toole, McLaughlin<br>  McGlamery & Loughman Co., LPA<br>5455 Detroit Road<br>Sheffield Village, Ohio 44054 |
| | Atty. Frederick C. Emmerling<br>114 W. Sixth Street<br>P.O. Box 25<br>East Liverpool, Ohio 43920 |
| For Ohio Public Works Commission: | Atty. Michael DeWine<br>Attorney General of Ohio<br>Atty. William J. Cole<br>Atty. Keith A. McCarthy<br>Assistant Attorneys General<br>30 East Broad Street, 26th Floor<br>Columbus, Ohio 43215 |
| For Ohio Water Development Authority: | Atty. Shannon K. Benton<br>Squire, Sanders<br>2000 Huntington Center<br>41 South High Street<br>Columbus, Ohio 43215 |

WAITE, P.J.

{¶1} This is an expedited appeal in a garnishment action. There are two Appellants in this matter: the judgment debtor Buckeye Water District ("BWD"); and the Ohio Public Works Commission ("OPWC"), which claims to have an interest in amounts deposited in one or more of the accounts being garnished. BWD is a water district organized under the authority of R.C. Chapter 6119. Appellee is the City of East Liverpool ("East Liverpool"). The garnishee is CFBank (formerly known as Central Federal Savings & Loan) in Wellsville, Ohio.

{¶2} In 1995, East Liverpool entered into a long-term contract to provide water to Columbiana County, Ohio, and the performance of this contract was assigned to BWD shortly thereafter. The contract required BWD to purchase a certain minimum amount of water for the life of the contract, which was to expire in 2025. In 2005, East Liverpool filed a breach of contract action in the Columbiana County Court of Common Pleas against BWD due to its failure to continue purchasing the minimum amounts of water required by the water contract. In February 2008, East Liverpool won a $9.7 million judgment against BWD. The judgment was reduced to $4.8 million on appeal to this Court. *E. Liverpool v. Buckeye Water Dist.*, 7th Dist. No. 08 CO 19, 2010-Ohio-3170, appeal not accepted for review 127 Ohio St.3d 1461, 2010-Ohio-6008, 938 N.E.2d 363 (December 15, 2010).

{¶3} East Liverpool then initiated garnishment proceedings against various banks in which BWD was thought to have accounts in order to collect on the judgment. One of those was CFBank. Seven accounts at CFBank were identified as

garnishable. The accounts contained over $4.5 million. After the garnishment order was served, all of the accounts were frozen by the court except for a general operating account so that BWD could carry on its day to day operations. OPWC intervened in the garnishment action to protect its interests in loans that it had made to BWD. OPWC moved to vacate the garnishment proceedings. This motion was dismissed. The trial court eventually overruled all objections to the garnishment action, leading to this expedited appeal.

{¶4} There are two basic issues on appeal. BWD first argues that sovereign immunity bars East Liverpool's garnishment action, but we find no support for that conclusion in either Ohio caselaw or statutory law. R.C. Chapter 6119, which governs water and sewer districts such as BWD, allows a water district to be sued on its contracts. R.C. Chapter 2744, which provides for some types of statutorily based governmental immunity, does not grant immunity from contract disputes. In addition, the record reflects that BWD, as a water district, is performing a proprietary rather than a purely governmental function, and the assets associated with this proprietary function may be attached in garnishment.

{¶5} In BWD's second line of argument it asserts that the funds in the CFBank accounts are subject to revenue liens that have priority over East Liverpool's judgment lien. BWD argues that operation of R.C. 6119.12 created a lien on its revenues arising from over $15 million in bonds issued by BWD to the United States Department of Agriculture ("USDA") in 2002 and 2008. Although we agree that such a lien on net revenues exists, our review of the record shows that the terms of the

lien do not prevent East Liverpool from garnishing the CFBank accounts. The 2008 pledge agreement established a litigation reserve fund of $1.2 million that is not subject to the lien. The pledge agreements also allow for BWD's operational expenses to be paid first out of revenues, and the East Liverpool water contract is an operational expense. In addition, BWD has failed to trace any funds in the CFBank accounts to exempt sources, providing yet another reason to affirm the trial court's ruling. BWD has not established any other exemption or defense from garnishment that would prohibit the bank accounts from being garnished. OPWC argues that its debt is protected by a revenue lien, but there is no pledge agreement in the record establishing or defining this lien. Therefore, OPWC has no superior claim to the funds in the CFBank accounts. We find no merit in any of the assignments of error, and the judgment of the trial court is affirmed except for a modification to clarify the amount that is permitted to be garnished at this time. This matter must also be remanded to the trial court to effectuate the orderly disposition of the garnishment order.

## Background to the Garnishment Action

{¶6} On December 15, 1995, East Liverpool entered into a 30-year water service contract with the Board of Commissioners of Columbiana County. In 1996 the Board of Commissioners assigned the performance of the contract to BWD. The contract called for BWD to purchase at least 235,000 gallons of water per day. Starting in 2002, BWD gradually stopped purchasing the minimum amount of water under the contract, leading East Liverpool to file a breach of contract action on May

15, 2005. At the same time that BWD was reducing its usage of East Liverpool water, it also began planning, financing and building a new water treatment plant along with other major capital improvements.

{¶7} In May of 2002, BWD entered into a loan agreement with the United States Department of Agriculture ("USDA") for $1,498,000 to finance Phase I of a water line extension project, which included funding for the initial stages of their new water treatment plant. The loan agreement was in the form of bonds which were issued to the USDA on May 9, 2002. These were designated as "Water Resource Revenue Bonds, Series 2002." The bonds were issued in two series: "Series A" was for $500,000, and "Series B" was for $998,000. The interest and principal on these bonds was payable in annual installments through the year 2042. The bonds were issued under the authority of Resolution 27-2002 of the Board of Trustees of BWD, adopted on May 6, 2002, which stated:

> The Issuer hereby grants to the owners of the Bonds from time to time a first lien on the Revenues and the moneys and investments in the Revenue Fund, the Bond Payment Fund, the Reserve Fund and the Surplus Fund upon the terms set forth herein. (9/6/11 Tr., Pltf. Exh. B, Section 10(f), p. 7.)

**{¶8}** One of the terms of Resolution 27-2002 was that the principal and interest on the bonds would be paid from funds remaining after operating costs were paid:

WHEREAS, the Issuer [BWD] has established water rates and charges to be charged to and collected from all persons whose premises are served by a connection to the System (such rates and charges, as amended from time to time, and any other moneys received by or for the account of the System are collectively referred to herein as the "Revenues") which Revenues are designed and intended to provide a surplus, after the payment of costs of operating and maintaining the System, for the payment of the principal and interest on obligations incurred and to be incurred in connection with the System (including the water resource revenue bonds representing the Government Loan) and the provision of adequate reserves; (9/6/11 Tr., Pltf. Exh. B, p. 2.)

**{¶9}** The 2002 resolution established a four-tiered list of priorities for paying expenses from the Revenue Fund. The first priority payment was for "all reasonable and proper expenses of operating and maintaining the System". (9/6/11 Tr., Pltf. Exh. B, Section 7(i), p. 5.) The second priority for revenues was to establish a bond payment fund from which the interest and principal on the bonds would be paid. One-twelfth of the annual payment due on the bonds was to be deposited in the bond

payment fund each month. The third priority was the creation of a reserve fund to be used for system repairs and to pay interest and principal if the bond payment fund was insufficient. The minimum reserve allowed was $81,504. The remaining revenues were then designated as surplus and could be used for any purpose.

**{¶10}** In 2006 and 2007, BWD borrowed $13.8 million in the form of bond anticipation notes to create funding to build a new water tower, a raw water pump station, a new water treatment plant, and to add to its water distribution system. On October 10, 2008, BWD entered into another loan agreement with the USDA to convert the $13.8 million of temporary funding into a permanent bond debt to the USDA. Once again, the loan was to be in the form of water resource revenue bonds, designated as "Water Resource Revenue Bonds, Series 2008." The bonds were issued in four series. "Series A" was for $4.2 million. "Series B" was for $3.8 million. "Series C" was for $4.5 million. "Series D" was for $1.3 million. The interest and principal on these bonds was payable in annual installments through the year 2048. BWD approved the bonds in Resolution 22-2208. The definition of "revenues" in the 2008 bond resolution was different from that definition in 2002:

> WHEREAS, the Issuer [BWD] has or will establish water rates and charges to be charged to and collected from all persons whose premises are served by a connection to the System (such rates and charges, as amended from time to time, and any other moneys, *including the Government Grant and other grant funds*, received by or

for the account of the System are collectively referred to herein as the "Revenues") which are or will be designed and intended to provide a surplus, after the payment of costs of operating and maintaining the System, for the payment of the principal and interest on obligations incurred and to be incurred in connection with the System (including the Prior Bonds and the water resource revenue bonds representing the Government Loan) and the provision of adequate reserves; (Emphasis added.) (9/6/11 Tr., Pltf. Exh. C, p. 3.)

**{¶11}** The specifications of the reserve fund in the 2008 resolution were modified somewhat from the 2002 resolution. The 2008 resolution called for the deposit of $1,959,750 into the reserve fund. Part of this reserve fund was for "the payment of costs related to litigation or the settlement thereof". (9/6/11 Tr., Pltf. Exh. C, Section 7(iii), p. 10.) The litigation reserve amount was set at $1,209,686, and was deposited on the closing date of the bond issuance "as a reserve against pending litigation and it is anticipated that the Additional Reserve Amount will be released from the Reserve Fund upon the conclusion of such litigation and it does not regard the Additional Reserve Amount as an additional source for the payment of Debt Service on the Obligations." (9/6/11 Tr., Pltf. Exh. D, Certificate of Purchaser.) Resolution 22-2008 established that the remaining minimum reserve, apart from the litigation reserve, could not be less than $750,064.

**{¶12}** Prior to the issuance of the final judgment in the East Liverpool water contract dispute, BWD had also entered into loan agreements with the Ohio Water Development Authority ("OWDA") and the OPWC. The OWDA loans are not part of this appeal. BWD currently owes OPWC over $1 million and is required to make annual payments of approximately $82,300, stemming from loans obtained in 1993, 2000, 2002, 2003, 2005 and 2006.

**{¶13}** On May 19, 2005, East Liverpool filed a breach of contract action against BWD and Columbiana County. On February 13, 2008, the trial court awarded judgment in favor of East Liverpool in the amount of $9.7 million. East Liverpool filed a judgment lien on February 15, 2008.

**{¶14}** The case was then appealed to this Court. On May 23, 2008, the trial court granted a stay of the monetary judgment pending the outcome of the appeal. On June 21, 2010, we affirmed the judgment in favor of East Liverpool, but modified the award to $4.8 million. The case was further appealed to the Ohio Supreme Court, which refused to accept the case for review on December 15, 2010. The judgment became final on that date.

**{¶15}** On December 21, 2010, East Liverpool filed a motion to lift the stay of execution of the judgment that the trial court had ordered on May 23, 2008. The stay was lifted on December 22, 2010. As of the date of the lifting of the stay, BWD had paid nothing on the judgment, had not established any payment plan to satisfy the debt, and had not included the judgment as an obligation in its bookkeeping system.

**{¶16}** On January 3, 2011, East Liverpool began garnishment proceedings in the Columbiana County Court of Common Pleas against all of BWD's bank accounts at CFBank. The garnishment order against CFBank was issued on January 4, 2011. The garnishment order was mailed to CFBank by certified mail on January 7, 2011, and was received on January 10, 2011. The garnishment order froze approximately $4.5 million in seven separate CFBank accounts.

**{¶17}** On January 13, 2011, BWD filed a motion for a temporary restraining order, arguing that the garnishment of the CFBank accounts, and the consequent freezing of the accounts, would immediately shut down the operations of the water district. East Liverpool filed a reply stating that it did not wish to shut down BWD's operations, and that it was willing to allow BWD to have access to sufficient funds to cover its reasonable, documented operating expenses.

**{¶18}** On January 20, 2011, the trial court issued a judgment entry partially lifting the freeze on the CFBank accounts. The court, by agreement of the parties, lifted the freeze on BWD's general operating account (also referred to as the "General Enterprise Fund") ending with the digits 4209 at CFBank in order for BWD to use this account in the normal course of business but for no other purpose. The remaining six accounts have remained frozen during the pendency of this litigation. The record indicates that on January 18, 2011, the General Enterprise Fund held $829,940.47, and the remaining six accounts held $3,690,277.11, for a total of $4,520,217.58.

{¶19} The OWDA and OPWC filed motions to intervene in the garnishment proceedings, and the motions were granted on February 25, 2011.

{¶20} On March 24, 2011, the trial court held a hearing to deal with various motions and objections to the garnishment order. The only witness at the hearing was Alfred DeAngelis, District Manager of BWD. On this same day, the OPWC filed a motion to vacate the garnishment order. The parties examined Mr. DeAngelis, but the remainder of the hearing was continued to a later date.

{¶21} On June 8, 2011, the trial court filed a judgment entry overruling OPWC's motion to vacate the garnishment order.

{¶22} The garnishment hearing continued on September 6, 2011. Testimony was heard from Mr. Dennis Schwallie, bond counsel for BWD, and Anthony D'Angelo, Fiscal Officer for BWD.

{¶23} The trial court issued a final garnishment order on December 13, 2011. The court overruled all prior objections to the garnishment order. The court then examined the various defenses being offered to prevent the garnishment of the CFBank accounts. The evidence presented at the hearing indicated that East Liverpool was attempting to garnish $4,216,750 of the approximately $4.5 million in the CFBank accounts. Appellants raised a number of defenses related to governmental immunity. The court had previously rejected any governmental immunity defenses in a judgment entry issued on June 8, 2011, and the court declined to revisit those arguments. The remaining arguments dealt with a series of "reserve funds" or "reserve accounts" set up within BWD's bookkeeping system.

BWD argued that these reserves were committed to be paid to the USDA, OWDA, OPWC, and others, who all had prior and superior liens on BWD's revenues. BWD also argued that some of the money at CFBank was part of a construction reserve fund dedicated to a specific construction project. BWD argued that these reserve funds could not be garnished due to the higher priority liens or prior pledged uses. Even though the alleged "reserve funds" did not directly correspond to the depositary accounts at CFBank, the court proceeded to examine each reserve fund to determine whether any of the money in any of the CFBank accounts should be exempt from garnishment.

{¶24} The court rejected BWD's argument that all its revenues from any source were protected by statutory revenue liens arising from the USDA bonds. The court held that BWD's argument did not comply with the " 'special fund' exemption" to the Ohio Constitution. The court determined that the USDA litigation reserve fund currently held $1,144,686. This fund was not exempt because it was not earmarked as a source for repayment of the USDA bonds. It was set aside for litigation expenses, which includes the instant litigation, and could be used as payment for the East Liverpool water contract litigation.

{¶25} The court determined that the USDA debt service reserve of $750,064 could be garnished because the terms of the lien held by USDA allowed for the payment of operational expenses prior to payment of debt service. The court held that the East Liverpool water contract was an operational expense that took priority over the USDA lien. The court held that two other USDA reserve funds, in the

amounts of $70,644 and $56,931, also allowed for the payment of operational expenses prior to debt service and could be garnished.

**{¶26}** The court held that a construction fund of $736,456 consisted of surplus funds and were not earmarked for construction. Since surplus funds could be used for any legitimate purpose, the court concluded that they could be used for operational expenses such as the East Liverpool water contract.

**{¶27}** The court held that an additional $551,644 claimed as construction funds were not categorized as construction funds in BWD's bookkeeping, and therefore, the funds could be used for any legitimate purpose, such as paying a judgment lien.

**{¶28}** The court found nothing in the record establishing that BWD had pledged revenues or any other asset relating to the OPWC loans. Thus, the reserve fund of $40,532 to OPWC was not protected from garnishment.

**{¶29}** The court determined that the money in the general enterprise account (or general operating account) in the amount of $838,322, consisted of surplus funds which could be used for any legitimate purpose of the water district. The court also determined that the money in the CFBank operating account could not be traced to any protected source that would be exempt from garnishment.

**{¶30}** The court found that the reserve fund of $27,468 relating to OWDA loans was protected and was exempt from garnishment.

**{¶31}** After rejecting all arguments except those relating to the OWDA reserve fund, the court overruled both the motion to modify the court's judgment entry of

January 20, 2011, and the motion to vacate and dismiss the garnishment order. According to a worksheet attached to the trial court's judgment entry, the court permitted East Liverpool to garnish $4,189,282.11 from the seven CFBank accounts.

**{¶32}** Two appeals immediately followed, one by BWD and one by OPWC. These appeals have been consolidated.

## Standard and Scope of Review

**{¶33}** No findings of fact or conclusions of law were requested from the trial court, and therefore, the fundamental standard that applies is that a judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Company v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). Questions involving statutory interpretation are reviewed de novo. *Akron Centre Plaza, L.L.C. v. Summit Cty. Bd. of Revision*, 128 Ohio St.3d 145, 2010-Ohio-5035, 942 N.E.2d 1054, ¶10.

**{¶34}** The judgment debtor may not use garnishment proceedings to relitigate the underlying debt. *Rak-Ree Ents., Inc. v. Timmons*, 10th Dist. Nos. 10AP–476, 10AP–556, 2011-Ohio-1090, ¶16. The scope of a garnishment hearing is "limited to the *judgment debtor's claims of exemption or any defense to the garnishment*." (Emphasis sic.) *Ashtabula Cty. Med. Ctr. v. Douglass*, 11th Dist. No. 1311, 1988 WL 59836, at *1 (June 3, 1988).

## Law governing garnishment actions

**{¶35}** "[S]o far as a debtor is concerned, * * * all of his property of whatever nature is subject to the payment of his debts unless there is some express statutory

exemption." *Marquis v. New York Life Ins. Co.*, 92 Ohio App. 389, 395-396, 108 N.E.2d 227 (1st Dist.1952). "Lands and tenements, including vested legal interests therein, permanent leasehold estates renewable forever, and goods and chattels, not exempt by law, shall be subject to the payment of debts, and liable to be taken on execution and sold * * *." R.C. 2329.01.

{¶36} Garnishment is a procedure whereby a creditor can obtain property of its debtor which is in the possession of a third party. R.C. 2716.11 authorizes the commencement of garnishment by a judgment creditor when supported by an affidavit stating:

(A) The name of the judgment debtor whose property the judgment creditor seeks to garnish;

(B) A description of the property;

(C) The name and address of the garnishee who may have in the garnishee's hands or control money, property, or credits, other than personal earnings, of the judgment debtor.

{¶37} It has been held that:

Property held by a third party is subject to garnishment to satisfy the debts of a judgment debtor when, at the time of the service of the garnishment order, the judgment debtor has a right or title to the property. * * * On the other hand, where the judgment debtor himself has no present right to obtain the money or property from the

garnishee, then the judgment creditor likewise has no right to the property. *Id.* *Toledo Trust Co. v. Niedzwiecki*, 89 Ohio App.3d 754, 757, 627 N.E.2d 616 (6th Dist.1993).

**{¶38}** The garnishor has the initial burden to prove that the property being garnished is the property of the judgment debtor. *Davis v. Sean M. Holley Agency, Inc.*, 2d Dist. No. 23891, 2010-Ohio-5278, ¶11.

**{¶39}** The judgment debtor may attempt to defeat the garnishment order by establishing an exemption or other defense to garnishment. "The burden of proof on the existence or applicability of an exemption or defense *rests with the judgment debtor.*" (Emphasis sic.) *Ashtabula Cty. Med. Ctr., supra,* at \*2, citing *Hoffman v. Weiland*, 64 Ohio App. 467, 29 N.E.2d 33 (1st Dist.1940). The judgment debtor may object to the attachment of the property and request a hearing. R.C. 2716.13(B). "The hearing is limited to the consideration of the amount of property of the judgment-debtor in the hands of the garnishee that can be used to satisfy all or part of the debt owed by the judgment-debtor to the judgment-creditor." *Marinik v. The Cascade Group*, 103 Ohio Misc.2d 18, 22, 724 N.E.2d 877 (M.C.1999).

**{¶40}** Garnishment of bank accounts involves additional considerations not applicable to other types of personal property. "The relationship between a bank and its depositor is a debtor-creditor relationship. '* * * [M]oney deposited in a bank becomes the property of the bank and is available for use by the bank in its business. The depositor becomes a creditor of the bank in the amount of the deposit with the

right to have this debt repaid in whole or in part on demand,' 1 Natter, Schlichting, Rice & Cooper, Banking Law (1991) 9-19, Section 9.05, subject to the terms of the depositary agreement between the bank and the depositor, *Fourth & Central Trust Co. v. Rowe* (1930), 122 Ohio St. 1, 170 N.E. 439, paragraph two of the syllabus; *Gall v. Central Trust Co.* (1937), 57 Ohio App. 168, 25 Ohio Law Abs. 550, 10 O.O. 303, 12 N.E.2d 782.  Thus, where the depositor is a judgment debtor and the bank is a garnishee, the property being garnished is, strictly speaking, not the funds themselves, but the debtor's contractual right to receive them."  *Goralsky v. Taylor*, 59 Ohio St.3d 197, 198, 571 N.E.2d 720 (1991).

**{¶41}** "[A] bank responding to an order of garnishment must determine whether the debtor has a right to receive the funds in a joint account.  If the debtor has a right to receive the funds, the bank must remit the funds."  *Ingram v. Hocking Valley Bank*, 125 Ohio App.3d 210, 219, 708 N.E.2d 232 (4th Dist.1997).

**{¶42}** The general test for whether a bank is required to release funds to the garnishor is whether or not the judgment debtor could sue the bank for release of the funds.  *First Bank of Marietta v. Mascrete, Inc.*, 125 Ohio App.3d 257, 263, 708 N.E.2d 262 (4th Dist.1998); *Marquis*, *supra*, 92 Ohio App. at 396.

**{¶43}** Commingled funds which belong to a third party, but which are deposited in an account which names the judgment debtor, may be garnished:

"[E]ven though the deposits are legally the property of the tenants, it is the name on the account that determines whose creditor

may attach the funds in the account. By following the procedures delineated in Chapter 2716 of the Revised Code, a judgment creditor may garnish the property of the judgment debtor, even if that property is in the possession of a third party, such as a bank. R.C. 2716.01(B). When a bank receives a garnishment notice, it looks to the name on the account to determine whether garnishment of that account is proper. "If the judgment debtor has a contractual right to demand payment of the funds, then those funds held for the benefit of the judgment debtor may be subject to garnishment." *Leman v. Fryman*, Hamilton App. No. C-010056, at ¶15. Thus in garnishment proceedings, the court is not concerned with who actually owns the property subject to garnishment as it is with who possesses it. "A court will not ordinarily entertain favorably a motion to discharge an attachment on the claim that the attached property does not belong to the moving party, particularly where the authenticity of such claim is questionable." *Rice v. Wheeling Dollar Savings & Trust Co.* (1951), 155 Ohio St. 391, 99 N.E.2d 301, paragraph four of the syllabus. *Dovi Interests, Ltd. v. Somerset Point Ltd. Partnership*, 8th Dist. No. 82788, 2004-Ohio-636, ¶12.

{¶44} "In Ohio, a judgment lien does not attach to personal property and so is not perfected until the property is seized in execution." *Nelson Sand & Gravel, Inc. v. Erie Shores Resort and Marina, Inc.*, 91 Ohio App.3d 649, 654-655, 633 N.E.2d 557

(11th Dist.1993). The personal property associated with a garnishment order attaches on the date the garnishment order is served. R.C. 2716.13(B); *Bitter v. Jones*, 6th Dist. No. OT-98-022, 1999 WL 94577, *4.

## BWD'S ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN HOLDING THAT A JUDGMENT CREDITOR COULD GARNISH THE GOVERNMENTAL PROPERTY OF A POLITICAL SUBDIVISION.**

**{¶45}** The issues raised under this assignment of error deal with the fundamental question as to whether the remedy of garnishment may be used, under any circumstances, against an entity such as BWD. Both Appellants argue that BWD is a political subdivision and that political subdivision immunity prevents the garnishment of the property of a political subdivision. Appellants submit that, even though governmental immunity may not have been a determinative issue in the underlying contract dispute, it may be raised separately as a defense in the garnishment action. Appellants promulgate this argument even though they themselves have cited caselaw from this Court holding that political subdivisions are subject to garnishment proceedings as judgment debtors, and more specifically, that water works property owned by a political subdivision is subject to levy by creditors. *State ex rel. Baldine v. Davis*, 1 Ohio App.2d 117, 204 N.E.2d 91 (7th Dist.1964). Nevertheless, Appellants insist that some type of statutorily or judicially created

governmental immunity exists to protect the funds that BWD has deposited with CFBank. We will examine each of the arguments in turn.

**{¶46}** There is no question that a water district such as BWD is considered to be a political subdivision in Ohio. R.C. 6119.011. Political subdivisions in Ohio had formerly been immune from lawsuits under the judicial doctrine of sovereign immunity. *Thacker v. Bd. of Trustees of Ohio State Univ.*, 35 Ohio St.2d 49, 298 N.E.2d 542 (1973). The doctrine of sovereign immunity was judicially abolished in Ohio in 1982. *Haverlack v. Portage Homes, Inc.*, 2 Ohio St.3d 26, 442 N.E.2d 749 (1982). In 1985 the Ohio legislature, as a response to the *Haverlack* case, adopted R.C. Chapter 2744, which sets forth the statutorily created form of governmental immunity that exists today. R.C. Chapter 2744, though, does not provide governmental immunity from all lawsuits against the state or its political subdivisions. It only protects against the types of lawsuits specifically described in the statute.

**{¶47}** R.C. Chapter 2744 provided no statutory immunity for contract claims brought against a political subdivision. R.C. 2744.09(A) specifically states: "This chapter does not apply to, and shall not be construed to apply to, the following: (A) Civil actions that seek to recover damages from a political subdivision or any of its employees for contractual liability[.]" R.C. 2744.09(A) has been consistently interpreted to mean that political subdivisions cannot claim governmental immunity for breach of contract claims. *Finn v. James A. Rhodes State College*, 191 Ohio App.3d 634, 2010-Ohio-6265, 947 N.E.2d 236 ¶25 (3d Dist.); *Thompson v. Germantown Cemetery*, 188 Ohio App.3d 132, 2010-Ohio-1920, 934 N.E.2d 956,

¶16-18 (2d Dist.); *Viola Park, Ltd. v. Pickerington*, 5th Dist. No. 2008 CA 00052, 2010-Ohio-584, ¶41; *Sullivan v. Anderson Twp.*, 1st Dist. No. C-070253, 2009-Ohio-6646, ¶14; *Carter v. Complete Gen. Constr. Co.*, 10th Dist. No. 08AP-309, 2009-Ohio-6308, ¶16. Since there is no political subdivision immunity for the underlying contract action that resulted in the judgment against BWD, we can find no reason why East Liverpool should not be permitted to use the various legal mechanisms available, such as garnishment, to collect its judgment on the breach of contract claim.

{¶48} Furthermore, the statutes authorizing the creation of regional water and sewer districts (such as BWD) specifically abrogate any immunity from breach of contract lawsuits: "[S]aid district shall exercise in its own name all the rights, powers, and duties vested in it by Chapter 6119. of the Revised Code, and, subject to such reservations, limitations and qualifications as are set forth in this Chapter, such district may: * * * (D) Sue and plead in its own name; be sued and impleaded in its own name with respect to its contracts or torts * * *." R.C. 6119.06(D). Since the common law rule is that all property of a judgment debtor is subject to the payment of its debts, we again find no reason why BWD's bank accounts would not be subject to pay the East Liverpool judgment lien. *Marquis, supra,* 92 Ohio App. at 395-396.

{¶49} We note that R.C. 2744.06 prohibits garnishment actions against the real or personal property of a political subdivision when the case involves "a civil action to recover damages for injury, death, or loss to person or property caused by an act or omission of the political subdivision or any of its employees in connection

with a governmental or proprietary function." This prohibition against garnishment does not apply here because, as stated above, R.C. Chapter 2744 does not apply to breach of contract claims, and the garnishment action in this appeal arises from a breach of contract claim.

{¶50} Appellants argue that only property held by a political subdivision in its proprietary capacity is subject to garnishment. They contend that BWD owns all of its property in a governmental capacity and not a proprietary capacity. Therefore, they claim that no property is available for garnishment. Governmental functions are those "imposed upon the state as obligations of sovereignty, such as protection from crime, or fires, or contagion, or preserving the peace and health of citizens and protecting their property[.]" *City of Wooster v. Arbenz*, 116 Ohio St. 281, 284, 156 N.E. 210 (1927). Proprietary functions are those voluntarily undertaken by the state for the comfort and convenience of its citizens. *Id.* at 285.

{¶51} Appellants would have us rely on the reasoning set forth in *State ex rel. First Natl. Bank v. Botkins*, 141 Ohio St. 437, 48 N.E.2d 865 (1943), to support the conclusion that water district property is derived from a governmental function and as such may not be garnished. *State ex rel. First Nat'l Bank* held that "[p]roperty held by a municipality in its proprietary capacity, as distinguished from its governmental capacity, is subject to levy and sale after judgment." *Id.* at 442. Assuming arguendo that this holding may continue to apply even after the judicial abrogation of sovereign immunity in *Haverlack, supra,* we do not believe the holding supports Appellants' position in this appeal. *See, e.g., Jaegers v. City of Cleveland*, 8th Dist. No. 45463,

1983 WL 5815 (Mar. 3, 1983). Appellants' reliance on *State ex rel. First Nat'l Bank* is misplaced for the simple reason that BWD, as a water district, is engaged in a proprietary activity. Hence, its property is subject to execution, levy, attachment and garnishment. We have previously held that: "The operation of a water works and distribution system is generally admitted to be performed in a proprietary capacity in this state. *City of Barberton v. Miksch*, 128 Ohio St. 169, 190 N.E. 387; *Mahoning County Commissioners v. City of Youngstown*, 49 Ohio Law Abs. 186, 75 N.E.2d 724. In other states where this rule exists levy may be made on waterworks property. *City of Hazard v. Duff*, 287 Ky., 427, 154 S.W.2d 28; see *Fred Berlonti & Son, Inc. v. Borough of Manheim Authority,* 93 F.Supp. 437." *State ex rel. Baldine*, *supra*, 1 Ohio App.2d at 119, 204 N.E.2d 91.

**{¶52}** Other cases more recent than our 1964 *Baldine* opinion continue to affirm the principle that the operation of a water system is a proprietary function. "It is clear that the city of Cleveland, in the operation of its Water Department, acts in a proprietary capacity." *Ranells v. City of Cleveland*, 41 Ohio St.2d 1, 4, 321 N.E.2d 885 (1975), fn.1. *See, also, November Properties, Inc. v. City of Mayfield Heights*, 8th Dist. No. 39626, 1979 WL 210535 (Dec. 6, 1979); *Seiler v. Norwalk*, 192 Ohio App.3d 331, 2011-Ohio-548, 949 N.E.2d 63; *Franklin v. Columbus*, 130 Ohio App.3d 53, 719 N.E.2d 592 (10th Dist.1998). In view of the fact that the Ohio Supreme Court, as well as various appellate courts (including this Court), treat the operation of water works as a proprietary function, we find no merit in Appellants' argument that BWD is engaged in a governmental function and its assets may not be garnished.

**{¶53}** Appellants further argue that the activities of a water district are statutorily defined as governmental, and for that reason, we should not rely on previous caselaw defining the operation of a water department as a proprietary function. Appellants cite R.C. 6119.40, which states:

6119.40 **Exemption from Taxes.**

The exercise of the powers granted by Chapter 6119. of the Revised Code, will in all respects be for the benefit of the people and for the increase of their prosperity and the improvement of their health and living conditions. The operation and maintenance of public works by the board of trustees of a regional water and sewer district constitute the performance of essential governmental functions. Such district shall not be required to pay any taxes or assessments upon any real or personal property acquired, owned, used, or controlled by it under Chapter 6119. of the Revised Code, or upon the income or gross receipts therefrom, and the bonds and notes issued under such sections and the transfer of income therefrom, including any profit made on the sale thereof, shall at all times be free from taxation within the state.

**{¶54}** It is apparent from the wording, context, and even the title of the statute, that the object of R.C. 6119.40 is to exempt a water district from certain types of

taxation, and that for purposes of taxation, a water district performs "essential governmental functions". The phrase "performance of essential governmental functions" occurs 14 times in the Ohio Revised Code, and each time it refers to exemption from taxation. R.C. 122.34; 122.61; 122.79; 351.12; 1555.16; 3706.15; 3737.948; 5531.17; 5537.20; 5540.14; 5593.22; 6119.40; 6121.16; 6123.16. In no instance is this phrase used in reference to political subdivision immunity or in the context of levy, execution, garnishment, attachment, or any other remedy for the collection of a judgment or debt. Further, the Ohio Supreme Court has held that property may be treated as public or governmental property for purposes of exemption from taxation, but may be treated as property in service of a proprietary function for purposes of governmental immunity. *City of Columbus v. Delaware County*, 164 Ohio St. 605, 132 N.E.2d 747 (1956). We find no reason to interpret R.C. 6119.40 in any fashion other than a tax exemption statute that has no bearing on the issues in this case.

{¶55} Appellants' insistence that R.C. Chapter 6119 prohibits garnishment of the assets of a water district is unwarranted as that chapter is silent as to garnishment. Appellants raise other arguments arising out of R.C. 6119.12 and 6119.15 that relate to the issuance of water resource bonds and notes, and these arguments will be treated under the remaining assignments of error.

{¶56} Finally, we are aware of the line of cases that hold that political subdivisions are not subject to be named as garnishees in a garnishment action. We agree with the principle, but it does not affect the outcome of this appeal. For

example, in *Doss v. Thomas*, 183 Ohio App.3d 795, 2009-Ohio-2275, 919 N.E.2d 219 (10th Dist.), the trial court presided over a contempt action against the Franklin County Jobs and Family Services ("FCJFS") arising from FCJFS failing to comply with a garnishment order.  The judgment creditor sought to garnish funds held by FCJFS that were owed to the judgment debtor, a daycare center.  Thus, FCJFS was listed as the garnishee.  FCJFS failed to file an "answer of garnishee" or remit the funds in their possession, leading to the contempt action.  The Tenth District Court of Appeals held:  "Without express statutory authorization for counties and their agencies to be summoned as a garnishee in a nonwage garnishment action under R.C. Chapter 2716, plaintiff could not maintain the garnishment proceedings against FCJFS.  The trial court as a result had no valid basis to summon FCJFS as a garnishee in the proceedings." *Id.* at ¶18.

**{¶57}** The garnishee in this appeal is a CFBank, which is a private financial institution and not a political subdivision.  Nothing in *Doss* or the cases cited within *Doss* prohibits the garnishment of a judgment debtor's deposits in a bank account even if the judgment debtor happens to be a political subdivision.

**{¶58}** None of Appellants' arguments relating to the governmental immunity of BWD have merit and they are overruled.

## BWD'S ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN HOLDING THAT FUNDS WHICH DEFENDANT-APPELLANT HAS PLEDGED TO THE UNITED**

**STATES DEPARTMENT OF AGRICULTURE TO SECURE WATER RESOURCE REVENUE BONDS ARE SUBJECT TO GARNISHMENT.**

**{¶59}** This assignment of error raises issues related to BWD's issuance of bonds to the USDA in 2002 and 2008. We note at the outset that the only funds being discussed under this assignment of error are funds related to the repayment of debt owed by BWD to the USDA. The OPWC has filed its own assignment of error with respect to its loan agreements with BWD.

**{¶60}** BWD argues that the funds in the garnished bank accounts are derived from revenues that have been pledged to the USDA to secure two series of water resource revenue bonds. The first series of bonds, issued in 2002, totaled $1,498,000. The 2008 bond series totaled $13,800,000. BWD is scheduled to make annual payments on the 2002 bonds until 2042, and will be paying on the 2008 bonds until 2048. BWD contends that USDA owns a security interest in the revenues in the form of a revenue lien. BWD claims that BWD and the USDA perfected liens on all of BWD's revenues in 2002 and 2008. BWD argues that these perfected liens are superior to any claim arising from East Liverpool's water contract, from the judgment lien filed on February 15, 2008, or from the garnishment order served on CFBank issued on January 10, 2011. A few preliminary comments are required, here.

**{¶61}** First, although this assignment of error deals primarily with issues relating to secured transactions, the Uniform Commercial Code ("UCC") provisions

dealing with secured transactions (R.C. Chapter 1309) do not govern this case. R.C. 1309.109(D)(14) states that R.C. Chapter 1309 does not apply to governments, states, or governmental units. Thus, common law principles will be applied to the secured transaction issues in this appeal rather than UCC provisions. We are mindful, though, of caselaw applying UCC Section 9-322 (equivalent to R.C. 1309.322) that substantially agrees with our conclusion below that a judgment creditor who satisfies its judgment by garnishing a bank deposit account takes the funds in the account free of any prior security interest in the funds. *Orix Fin. Serv., Inc. v. Kovacs*, 167 Cal.App.4th 242, 83 Cal.Rptr.3d 900 (2008).

**{¶62}** Second, there is no indication from the record that any entity other than BWD has control over the bank accounts at CFBank. Thus, no argument is being raised that the USDA or OPWC has a security interest or any other defense from garnishment arising from direct control over the accounts that were garnished.

<u>Priority of the lien created by R.C. 6119.12</u>

**{¶63}** The first argument made by BWD is that R.C. 6119.12 establishes a statutory "super-priority" lien of revenues pledged to pay water resource revenue bonds, such as the bonds issued to the USDA in 2002 and 2008. BWD contends that East Liverpool cannot garnish any funds in the CFBank accounts due to the super priority lien held by the USDA. East Liverpool agrees that R.C. 6119.12 allows for revenue bonds to be issued that create a lien on the revenues of a water district to pay such bonds. East Liverpool contends, though, that the terms of the lien (including the type of revenue pledged and any exceptions to the lien) are defined by

the wording of the pledge itself. East Liverpool argues that the 2002 and 2008 pledge agreements for the USDA bonds allow for its judgment against BWD to be paid out of BWD's revenues. The first matter is to decide whether there is a lien on BWD's revenues, and the priority of that lien.

**{¶64}** The parties agree that, under certain circumstances, property that is pledged to another may have a superior claim to a judgment creditor who attaches the same property in garnishment. "As a general rule, rights of a pledgee are superior to the rights of an attaching creditor under a subsequent attachment." 24 Ohio Jurisprudence 3d, Creditors' Rights and Remedies, Section 477 (2012). This is not a bright line rule, and the rights of the pledgee are affected by the terms of the pledge and whether the pledge is absolute or conditional. *Id.*

**{¶65}** In this case, the right of BWD to pledge its revenues as collateral for revenue bonds arises from R.C. 6119.12, which states in pertinent part:

A regional water and sewer district may, from time to time, issue water resource revenue bonds and notes of the district in such principal amount as, in the opinion of the board of trustees of the district, are necessary for the purpose of paying any part of the cost of one or more water resource projects or parts thereof. * * * Except as may otherwise be expressly provided by the district, every issue of its water resource revenue bonds or notes shall be obligations of the district payable out of the revenues of the district, which are pledged for such payment,

without preference or priority of the first bonds issued, subject only to any agreements with the holders of particular bonds or notes pledging any particular revenues * * *. Such pledge shall be valid and binding from the time the pledge is made, the revenues so pledged and thereafter received by the district shall immediately be subject to the lien of such pledge without any physical delivery thereof or further act, and the lien of any such pledge is valid and binding as against all parties having claims of any kind in tort, contract, or otherwise against the district, irrespective of whether such parties have notice thereof, except as provided in section 319.61 of the Revised Code with respect to special assessments.

**{¶66}** The USDA bonds issued in 2002 and 2008 were intended to be "water resource revenue bonds" as defined in R.C. 6119.12. We have found no prior caselaw directly interpreting R.C. 6119.12. "When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need for this court to apply the rules of statutory interpretation." *Symmes Twp. Bd. of Trustees v. Smyth*, 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000). Our reading of the plain meaning of the statue indicates that: (1) a water district's revenues may be pledged to pay water resource revenue bonds; (2) a lien arises from the pledging of revenues to pay the bonds; (3) the pledge agreement is subject to the requirements and limitations imposed by R.C. Chapter 6119; (4) the specific parameters of the lien, as

well as the type of revenue subject to the lien (such as gross revenue or net revenue), are determined by the wording of the particular pledge agreement; (5) the lien arises and is perfected on the date the pledge is made; and (6) the lien only affects revenues received after the date of the pledge.

**{¶67}** We also hold that R.C. 6119.12 does not discuss or create any type of super-priority lien. A classic example of a super-priority lien is a Medicare lien, which is automatic, all-encompassing, and superior to practically all other interests. *See, e.g. Pallay v. Nationwide Ins. Co.*, 165 Ohio App.3d 242, 2005-Ohio-5932, 846 N.E.2d 58, ¶46 (7th Dist.) ("federal law gives Medicare very powerful subrogation rights, often referred to as a Medicare lien * * * this right of subrogation is superior to any other right, interest, judgment, or claim".) The lien that arises from R.C. 6119.12 does not resemble a Medicare lien. The lien arising from R.C. 6119.12 is not self-executing, but rather, is created by a pledge agreement. The terms of the lien are defined by the pledge agreement, and are therefore also limited by the pledge agreement. The lien arises at a specific point in time, that is, "from the time the pledge is made". R.C. 6119.12. Under the common law, the general rule of priority of liens is "first in time, first in right." *Elstner v. Fife*, 32 Ohio St. 358, 373 (1877); *Nelson Sand & Gravel, Inc., supra*, 91 Ohio App.3d at 655, 633 N.E.2d 557; *Wells Fargo Bank v. Schwartz*, 8th Dist. No. 96641, 2012-Ohio-917, ¶9. There is nothing in R.C. 6119.12 that conflicts with the rule of "first in time, first in right." The lien permitted by R.C. 6119.12 is similar to most other liens created by contract, and it is the terms of the lien agreement or pledge that defines the rights of the secured party.

**{¶68}** R.C. 6119.12 also defines when the revenue lien is perfected: "Such pledge shall be valid and binding from the time the pledge is made, the revenues so pledged and thereafter received by the district shall immediately be subject to the lien of such pledge * * *." A lien arising under R.C. 6119.12 has certain advantages over liens that need a further act to be performed prior to perfection of the security interest. A R.C. 6119.12 lien is perfected immediately on the date of the pledge without any other action being taken: "the revenues so pledged and thereafter received by the district shall immediately be subject to the lien of such pledge without any physical delivery thereof or further act, and the lien of any such pledge is valid and binding as against all parties having claims of any kind in tort, contract, or otherwise against the district, irrespective of whether such parties have notice thereof * * *."

**{¶69}** The date of the 2002 BWD bond resolution authorizing the bonds was May 6, 2002, and the bonds themselves were issued on May 9, 2002. The date of 2008 BWD resolution is October 13, 2008, which is the same date the bonds were issued. These are the relevant dates for determining USDA's perfected lien on BWD's revenues.

**{¶70}** Assuming for the moment that the CFBank accounts contain BWD's "revenues" as contemplated by R.C. 6119.12, we must now determine when East Liverpool's rights in those revenues was perfected. Although East Liverpool obtained its judgment on February 13, 2008, and filed its judgment lien on February 15, 2008, these dates do not define when East Liverpool perfected its interest in the garnished

accounts. "[A] judgment lien does not attach to personal property and so is not perfected until the property is seized in execution." *Nelson Sand & Gravel, Inc., supra*, 91 Ohio App.3d at 654-655. The garnishment order attaches to all property that comes into the hands of the garnishee from the date of service of the garnishment order. *McKinney, Inc. v. Wyman Corp.*, 102 Ohio App.3d 648, 652, 657 N.E.2d 812 (8th Dist.1995); R.C. 2716.13(B). Service of the order perfects an execution lien in favor of the judgment creditor on the garnished property. *Marinik, supra,* 103 Ohio Misc.2d at 23. We must look to the record to discover when the garnishment order was served.

{¶71} Service of a garnishment order on the garnishee is obtained in the same way as a summons is served. R.C. 2716.13(B). Service was made on CFBank by certified mail on January 10, 2011. Therefore, attachment was complete on January 10, 2011. This date is well after the 2002 and 2008 dates that the USDA revenue liens were perfected. Based on the "first in time, first in right" rule, the revenue liens associated with the 2002 and 2008 USDA bond pledges have priority over the lien imposed on the CFBank accounts arising from the East Liverpool garnishment action in January 2011.

{¶72} Although we have established that the USDA has a higher priority lien than East Liverpool on BWD's revenues, this conclusion does not end the discussion as to whether East Liverpool may garnish the CFBank accounts. First, we must decide whether the Ohio Constitution permitted BWD to pledge its revenues in the manner argued by BWD in this appeal. The Ohio Constitution sets limits on what a

political subdivision may do with its revenues regardless of how those revenues are pledged. Second, we must consider the terms and conditions of the pledge agreements and related documents. Some of BWD's revenues were reserved to pay litigation expenses and were excluded from the lien altogether. Some of those terms allow for the East Liverpool judgment to be paid as an operational expense prior to any debt service on the USDA bonds. Finally, we need to address whether any of the funds in the CFBank accounts can properly be traced as revenues that are subject to a revenue lien.

<u>The scope of the revenue pledges and the " 'special fund' exemption"</u>

**{¶73}** Having determined that, at least in some respects, the USDA does have a higher priority lien on some aspect of BWD's revenues related to the issuance of the 2002 and 2008 bonds, we must now attempt to isolate which revenues, if any, are subject to the lien. BWD has argued that all of its revenues are pledged to pay the USDA bonds, regardless of the source of the revenue. BWD insists that it did not need to trace or isolate the source of the funds in the CFBank accounts because all of the funds in those accounts consist of BWD's current revenues, and thus, all of the money in the accounts is protected by virtue of the superior lien of the USDA. The trial court correctly recognized that BWD's argument cannot be judicially enforced as a defense to the garnishment action because it essentially asks the court to violate Section 11, Article XII of the Ohio Constitution, which states:

No bonded indebtedness of the state, or any political subdivisions thereof, shall be incurred or renewed unless, in the legislation under which such indebtedness is incurred or renewed, provision is made for levying and collecting annually by taxation an amount sufficient to pay the interest on said bonds, and to provide a sinking fund for their final redemption at maturity.

**{¶74}** Section 11, Article XII of the Ohio Constitution prohibits a political subdivision (and we have already agreed that BWD is a political subdivision) from taking on indebtedness unless there is an annual levy and collection of taxes to pay the interest on the indebtedness. *State ex rel. City of Columbus v. Ketterer*, 127 Ohio St. 483, 493, 189 N.E. 252 (1934). In essence, the constitution prevents current governing officials from determining future appropriations which should be left to the wisdom of the future officials. *Aldom v. City of Salem*, 7th Dist. No. 83-C-36, WL 7710, *1 (May 21, 1984).

**{¶75}** Section 11, Article XII of the Ohio Constitution is not violated when a political subdivision creates an indebtedness to be paid for wholly out of the income from the property that is being acquired, created, or funded by the debt. *State ex rel. Kitchen v. Christman*, 31 Ohio St.2d 64, 70, 285 N.E.2d 362 (1972), citing *State ex rel. Pub. Institutional Bldg. Auth. v. Griffith*, 135 Ohio St. 604, 612, 22 N.E.2d 200 (1939). This is known as the " 'special fund' exemption." *Id.*; *see also, Kasch v.*

*Miller*, 104 Ohio St. 281, 135 N.E. 813 (1922); *State ex rel. Allen v. Ferguson*, 155 Ohio St. 26, 97 N.E.2d 660 (1951). The " 'special fund' exemption" applies:

> Where the entire improvement is to be paid for by the issue and sale of bonds in the name of the state, and the principal and interest are to be paid entirely out of the revenues derived from the improvement or from the sale of the corpus in case of default, a state debt is not thereby incurred within the purview of the state constitution; nor do the bonds so issued become an obligation or pledge the credit of the state under the express provisions of Section 412-2, General Code. *Kasch, supra,* 104 Ohio St. 281, 135 N.E. 813 (1922), at paragraph one of the syllabus.

**{¶76}** The Ohio Supreme Court has held that "a debt is not incurred by a political subdivision where it merely incurs an obligation to apply revenue, to be received from property being acquired by it, to payment of the cost of the property being acquired." *State ex rel. Gordon v. Rhodes*, 158 Ohio St. 129, 135, 107 N.E.2d 206 (1952). Conversely, bonds paid for by revenues generated from the political subdivision's assets, "old as well as new, constitute a debt" and must conform to the debt provisions of the Ohio Constitution. *Griffith*, *supra*, 135 Ohio St. at 616, 22 N.E.2d 200.

**{¶77}** In other words, if a political subdivision commits its general revenue fund, including past as well as future revenues, to the payment of a bond issue, this

would not fall under the " 'special fund' exemption" and would constitute a general debt, requiring the prior allocation of taxes to pay the debt. *State ex rel. Ohio Funds Mgt. Bd. v. Walker*, 55 Ohio St.3d 1, 561 N.E.2d 927 (1990). Without the prior allocation of taxes to cover the debt, the debt becomes unconstitutional and unenforceable. *Id.*

{¶78} R.C. 6119.12 requires that "the revenues so pledged and *thereafter* received" are to be used to pay for bonds issued by a water and sewer district. (Emphasis added.) This requirement of using future revenues to secure revenue bonds is consistent with constitutional provisions described earlier. R.C. 6119.15 clarifies that the bonds issued under R.C. 6119.12 are meant to fall under the " 'special fund' exemption" and are not the type of indebtedness described in Section 11, Article XII of the Ohio Constitution. R.C. 6119.15 states:

> Water resource revenue bonds and notes and water resource revenue refunding bonds issued pursuant to Chapter 6119. of the Revised Code, do not constitute a debt, or a pledge of the faith and credit, of the state or of any political subdivision thereof, and the holders or owners thereof have no right to have taxes levied by the general assembly or taxing authority of any political subdivision of the state for the payment of the principal thereof or interest thereon, but such bonds and notes are payable solely from the revenues and funds pledged for their payment as authorized by such chapter, unless the notes are

issued in anticipation of the issuance of bonds or the bonds are refunded by refunding bonds issued under Chapter 6119. of the Revised Code, which bonds or refunding bonds shall be payable solely from revenues and funds pledged for their payment as authorized by such chapter. All such bonds and notes shall contain on the face thereof a statement to the effect that the bonds or notes, as to both principal and interest, are not debts of the state or any political subdivision thereof, but are payable solely from revenues and funds pledged for their payment.

All expenses incurred in carrying out Chapter 6119. of the Revised Code are payable solely from under such sections. Such sections do not authorize regional water and sewer districts to incur indebtedness or liability on behalf of or payable by the state or any other subdivision thereof.

**{¶79}** If we accept BWD's premise that all of its revenues, regardless of the source or the timing of those revenues, are committed to pay the 2002 and 2008 USDA revenue bonds, we would need to conclude that the bonds do not fall under the " 'special fund' exemption" and therefore violate the Ohio Constitution. BWD acknowledges that at least part of the funds in the CFBank accounts that it claims are "reserved funds," exempt from garnishment, are prior accumulated revenues that were then pledged to pay the debt service for the 2008 USDA bonds. Further, the

language of the 2008 revenue pledge also includes the pledge of "Government Grant and other grant funds," along with the pledge of future revenues. (9/6/11 Tr., Pltf. Exh. C, p. 3.) This certainly appears to be a pledge of past revenues (including revenues derived from sources unrelated to improvements funded by the USDA bonds). If there are past revenues committed to pay the 2008 bonds, the bonds would not fall under the " 'special fund' exemption," and we could not enforce the bonds or the liens supporting the bonds. The very nature of BWD's argument precludes us, on constitutional grounds, from granting relief.

{¶80} BWD argues that we should apply the "first in, first out" (FIFO) principle to the CFBank accounts as a means to satisfy the " 'special fund' exemption." FIFO is an accounting principle that relates primarily to valuing inventories, and contrasts with other accounting methods such as "last in, first out." *Howard Paper Mills, Inc. v. Lindley*, 2d Dist. No. CA 6522, 1980 WL 352536. The basic principle in FIFO is that, when funds are commingled in an account, the first items deposited are treated as the first items withdrawn from the account. BWD contends that under FIFO accounting, all of its revenues prior to 2002 would be treated as being the first items withdrawn from its accounts. BWD claims that it had a cash balance of $1,553,229 prior to the issuance of the 2002 bonds. BWD contends that this balance has long been spent, and that any money currently in its accounts consists of revenues subsequent to the 2002 bonds, and for this reason, the accounts would not violate the " 'special fund' exemption."

**{¶81}** This argument was not presented to the trial court and is waived for purposes of this appeal. Even if it were not waived, there is no evidence of any deposits or expenditures from the various CFBank accounts, and therefore, we have no evidence from which to perform a FIFO analysis. In addition, a FIFO analysis does not solve the basic constitutional problem stemming from BWD's decision to commit all of its revenues from whatever source to each individual bond issue, instead of segregating revenue streams based on the projects being funded by each bond. It is somewhat ironic that BWD wishes to be treated as a political subdivision for some aspects of this appeal, e.g., to obtain governmental immunity, but does not consider itself bound by the constitutional limits placed on political subdivisions with respect to revenue bonds and raising taxes to pay for debts.

**{¶82}** BWD contends that East Liverpool's argument regarding the " 'special fund' exemption" is impugning the constitutionality of R.C. 6119.12, and that the Ohio Attorney General should have been served with a copy of the complaint in order to defend the statute. BWD submits that we may not rule on the constitutionality of R.C. 6119.12 due to this procedural error, citing *State ex rel. Republic Servs. of Ohio v. Pike Twp. Bd. of Trustees*, 5th Dist. Nos. 2006 CA 00153, 2006 CA 00172, 2007-Ohio-2086. This argument is meritless. First, East Liverpool's position is that BWD has relied on an unconstitutional *argument* as part of its defense to garnishment, not an unconstitutional statute. East Liverpool is attempting to enforce, not invalidate, R.C. 6119.12. Second, the requirement to notify the Attorney General is specific to declaratory judgment actions under R.C. 2721.12 and does not limit a court from

otherwise reviewing the constitutionality of a statute. *Cleveland Bar Assn. v. Picklo*, 96 Ohio St.3d 195, 2002-Ohio-3995, 772 N.E.2d 1187. The instant appeal does not arise from a declaratory judgment action.

**{¶83}** BWD has failed to convince us that it was permitted to commit all of its revenues to secure the USDA bonds without violating the " 'special fund' exemption" and the Ohio Constitution. Therefore, we hold that a general lien on all of BWD's revenues in favor of the USDA is unenforceable and is not a reason to exempt funds from being garnished from the CFBank accounts.

<u>The Litigation Reserve</u>

**{¶84}** Having concluded that BWD cannot claim that all of its revenues are exempt from garnishment under a general revenue lien without violating the Ohio Constitution, we may now focus on individual aspects of the CFBank accounts that may or may not be exempt. BWD describes a variety of "funds" or accounts within its accounting system that it believes may be exempt. One of those funds is a litigation reserve fund set up as part of the 2008 USDA bond issuance. The USDA specifically requested this fund to be set up due to the litigation between East Liverpool and BWD that was pending on appeal when the 2008 bonds were issued. The litigation reserve was originally set at $1,209,686, but the record indicates that it had been reduced to $1,144,686.20 when garnishment was ordered. The litigation reserve served as "a reserve against pending litigation and it is anticipated that the Additional Reserve Amount will be released from the Reserve Fund upon the conclusion of such litigation and it does not regard the Additional Reserve Amount as an additional

source for the payment of Debt Service on the Obligations." (9/6/11 Tr., Pltf. Exh. D, Certificate of Purchaser.)

**{¶85}** Since this fund was specifically reserved with the instant litigation in mind, we find no reason for it to be excluded from garnishment. A final judgment has been issued in the contract dispute between East Liverpool and BWD. At the time that garnishment proceedings had begun, no further appeals were available in the underlying contract case. When the case became final, the litigation reserve funds we released back to BWD and are no longer subject to the USDA revenue lien.

<u>USDA revenue lien excludes operational expenses</u>

**{¶86}** The remaining "funds" that BWD claims are exempt from garnishment are a USDA Debt Service Reserve Fund ($750,064), and two USDA Payment Reserve Funds ($70,644.70 and $56,931.00). These "funds" are not bank accounts, but rather, items listed in BWD's accounting system. Assuming arguendo that these "funds" can be identified in the CFBank accounts, we agree with the trial court that they are not protected due to the provisions in the lien pledges relating to the payment of operating expenses. The record establishes that the USDA lien pledges are net revenue pledges rather than gross revenue pledges and that BWD's reasonable operating expenses are required to be deducted from revenues prior to calculating the lien. If the East Liverpool water contract judgment is a reasonable operating expense, then it would take priority over the lien on net revenues pledged to the USDA.

**{¶87}** Revenue bonds typically are protected by liens on either gross revenues or net revenues:

> Traditionally, revenue bonds are secured by a first lien on net revenues. This means that debt service is paid out of the *net revenues*, the funds that remain after the normal operating costs have been paid. A *gross lien bond*, on the other hand, is one where debt service is paid directly from the gross revenues before the payment of operating expenses. * * * First-lien bonds are also called senior-lien bonds. * * * Revenue bonds can also be backed by a GO [general obligation] pledge of the issuer. This means that the issuer does not dedicate specific revenue to the repayment of the bonds but, rather, pledges its general credit * * *." (Emphasis sic.) Temel, *The Fundamentals of Municipal Bonds* pp. 181-182 (5th Ed.2001).

**{¶88}** Both the 2002 and the 2008 bonds and their corresponding pledges provide that the revenues being pledged are future net revenues after taking operating costs into consideration. The 2002 bonds were authorized by BWD Resolution 27-2002 passed on May 6, 2002. This resolution granted the USDA "a first lien on the Revenues and the moneys and investments in the Revenue Fund, the Bond Payment Fund, the Reserve Fund and the Surplus Fund upon the terms set forth herein." (9/6/11 Tr., Pltf. Exh. B, Section 10(f), p. 7.) The resolution, though,

created a priority of payments from the Revenue Fund. The first priority payment was for "all reasonable and proper expenses of operating and maintaining the System". (9/6/11 Tr., Pltf. Exh. B, Section 7(i), p. 5.) The second priority for revenues was to establish a bond payment fund from which the interest and principal on the bonds would be paid. The third priority was the creation of a reserve fund to be used for system repairs and to pay interest and principal on the bond payment in case that specific fund was insufficient. Any remaining revenues were then designated as surplus and could be used for any purpose.

**{¶89}** The 2008 USDA bonds were protected by similar pledges. The 2008 USDA bonds were authorized by BWD Resolution 22-2208 passed on October 13, 2008. This resolution also pledged to pay the bond indebtedness using the revenues deposited in the Revenue Fund. Section 7 of Resolution 22-2208 stated that: "So long as any of the Series 2008 Bonds are outstanding, the Issuer shall continue to deposit the Revenues and make payments therefrom as required by the Original Resolution, and particularly Section 7 thereof". (9/6/11 Tr., Pltf. Exh. C, Section 7, p. 9.) Based on the earlier 2002 resolution, the first priority of payments from revenues was for the operation and maintenance of the system.

**{¶90}** The 2008 bonds themselves contained corresponding net revenue provisions. For example, "Water Resource Revenue Bond, Series 2002, Series A" states: "This Series 2002 Bond and the issue of which it is one * * * are payable solely from the revenues derived from water rates and charges (the "Revenues") to be charged to and collected from all persons whose premises are served by a

connection to the water supply, distribution and treatment system of the Issuer (the "System") * * * after provision only for the payment of all reasonable and proper expenses of operating and maintaining the System." Each series of the bonds contains a substantially similar provision.

{¶91} BWD's bond counsel, Mr. Schwallie, testified that operational expenses are paid out first from revenues:

Q. So it was contemplated that payment of costs of operating and maintaining the System would not be part of the pledged revenues; correct?

A. No, that's not correct. They are part of the revenues.

Q. But the intent was that they be used to pay for operation of the Systems; correct?

A. They are in the flow funds as the first use of the revenues.

Q. Right. So by agreement, you understood and agreed that those funds could be used for operation expense; correct?

A. Correct.

* * *

Q. So are you aware whether there are any limits or review placed on the district as to how they may pay operating costs?

A. No.

* * *

Q.      Do you have any knowledge of the U.S.D.A. reviewing the District's determinations as to what are appropriate operational expenses?

A.      Not to my knowledge.  (9/6/11 Tr., pp. 29-31.)

**{¶92}** Mr. Schwallie also testified that BWD could make the periodic payments required by the East Liverpool water supply contract without conflicting with any of the terms of the USDA revenue lien.  (9/6/11 Tr., pp. 37-38.)

**{¶93}** The trial court concluded that the East Liverpool judgment lien qualified as an operating cost for BWD that should be paid prior to payment of debt service on the bonds.  We agree.  The testimony by Mr. Schwallie, cited earlier, confirms that no restrictions were placed on the definition of "operating costs" or "operating expenses" in the bond pledges or in actual practice by BWD.  The phrase "operating expenses" has been defined as:  "Those expenses required to keep the business running, *e.g.*, rent, electricity, heat.  Expenses incurred in the course of ordinary activities of an entity."  *Black's Law Dictionary* 1091 (6th Ed.1990).  The East Liverpool water contract can be described as an agreement for the wholesale purchase of water by a water district for resale to its customers.  It is difficult to think of any more basic and necessary expense for a water district than the purchase of water for resale.  Such expenses take precedence over revenue liens:  "Some contract obligations have priority over even first-lien bonds; for example, a power supply contract for a public

utility is usually treated as an operating expense and paid before debt service on the contracted bond." Temel, *The Fundamentals of Municipal Bonds* 182 (5th Ed.2001).

**{¶94}** We are further persuaded that the East Liverpool water contract judgment is a legitimate operating expense based on the USDA's clear knowledge of the contract prior to the 2002 bond agreement, and its knowledge of the contract dispute prior to the 2008 bond agreement. The record contains a "CERTIFICATE AS TO PROPERTY, PLEDGE OF REVENUES AND OPERATIONS," dated April 29, 2002, describing BWD's prior commitments that would affect the 2002 bond issue. (3/24/11 Tr., Def. Exh. B.) Item five of this document states:

> 5.  (a) The continued operation of the Utility is not dependent upon any long-term supply or service contracts, and (b) such operation is further not dependent upon any substantial easements or other rights in land owned by other utilities, railroads or public bodies, except as disclosed to the United States of America, as the original purchaser of the Bonds, *except for a long-term water purchase contract with the City of East Liverpool, Ohio.* (Emphasis added.)

**{¶95}** This document reveals that the USDA was aware of and accepted the consequences of the East Liverpool water contract when it purchased the 2002 bonds. One of those consequences was that the water contract would be paid first as an operating expense prior to any right USDA would have in BWD's revenues.

**{¶96}** Equally significant is the fact that the USDA required a litigation reserve fund to be set up as a condition for purchasing the 2008 bonds. The litigation reserve was created as a direct consequence of the East Liverpool breach of contract case that was pending on appeal when the 2008 bonds were issued. Mr. Schwallie testified that he and the USDA were aware of the litigation between East Liverpool and BWD when he prepared the 2008 bond documents. (9/6/11 Tr., pp. 46-47.) In fact, the USDA specifically requested that the litigation reserve fund be included in the bond resolution. (9/6/11 Tr., p. 47.) Once again, the USDA entered into the bond agreement with full knowledge that the East Liverpool water contract would likely have an effect on BWD's revenues and on USDA's rights over that revenue. We are not inclined to exclude the East Liverpool water contract from the definition of operating expenses in this particular case when the USDA knew about and accepted the East Liverpool water contract as a prior obligation of BWD in both 2002 and 2008.

<u>Failure to trace, segregate or identify the funds in the CFBank Accounts</u>

**{¶97}** There is no dispute that the burden of establishing defenses to the garnishment action rested on BWD. "The judgment debtor bears the burden of proving that the funds in question are exempt." *Fifth Third Bank of Columbus, Inc. v. Bowman*, 10th Dist. No. 89AP-515, 1990 WL 12379, *2 (Feb. 13, 1990); *see also, Ashtabula Cty. Med. Ctr.*, *supra*, 11th Dist. No. 1331, 1988 WL 59836, *2.

**{¶98}** BWD, despite having the burden of establishing its defenses to garnishment, took the position at trial that it did not need to trace or identify the

source of the funds in any of the CFBank accounts. (3/24/11 Tr., pp. 26-27, 92-93.) Many of BWD's arguments on appeal, though, depend on a factual conclusion that the accounts being garnished contain revenues that were pledged at specific times for specific purposes, and due to those pledges, a prior and superior lien has attached to those revenues in favor of the USDA. Since BWD did not choose to trace any funds in the accounts at CFBank, questions that depend upon the tracing of funds to a specific source necessarily will be ruled on in favor of East Liverpool.

{¶99} The failure to trace BWD's revenues is particularly relevant to the constitutional question discussed earlier dealing with whether the USDA loans conform to the " 'special fund' exemption." Under this exemption, the only revenues that may be committed to pay for a revenue bond are revenues generated by the bond investment itself. In our review of the record, we find no identification of prior revenues, current revenues, or revenues associated with any specific aspect of the BWD system. We find no identification of revenues associated with any particular loan or bond issuance. Mr. DeAngelis, BWD's District Manager, testified that all of BWD's revenues are deposited in the General Enterprise account at CFBank, and bills, debt service, and debt reserve are then paid from the general account. (3/24/11 Tr., p. 111.) Mr. D'Angelo, BWD's fiscal officer, confirmed that BWD does not segregate revenues based on how or when the revenues are created. (9/6/11 Tr., pp. 93-94.) It certainly appears that BWD has committed all of its revenues, from whatever source or time period, to the USDA bonds, in violation of Section 11, Article XII of the Ohio Constitution. Our task in this appeal, though, is not to invalidate those

bonds, but only to determine whether the funds in the CFBank accounts are able to be garnished. Any enforcement of the type of general revenue lien described by BWD would result in the enforcement of a debt in violation of the Ohio Constitution. Since we cannot enforce the lien, at least as the lien has been defined by BWD, we cannot use the lien as a reason to prevent East Liverpool from garnishing the accounts.

{¶100} Because the Ohio Constitution does not allow a political subdivision to commit all of its revenues to secure a revenue bond, BWD was required to show that some specific and isolated stream of revenue was committed to pay the USDA bonds. Some of the types of revenue that are crucial to BWD's arguments on appeal and that have not been traced are: funds earmarked for specific construction projects; funds arising from revenues generated by specific construction projects; funds remaining after deducting operational and maintenance costs (i.e., net revenue funds); revenues generated after the date that pledge agreements were entered into; and funds left over from prior loans or grants. BWD has not even clearly identified which CFBank accounts contain funds set aside only for debt service or debt reserve, much less the source of those funds. Thus, even if BWD prevailed on the legal issues being raised under any of its assignments of error, we are faced with the practical problem that we could not identify the revenues that may be subject to a revenue lien. Therefore, we must conclude that all the funds in the CFBank accounts are subject to garnishment because they have not been traced to an exempt source. This constitutes an independent reason to affirm the trial court's judgment.

<u>USDA has no lien rights that can be enforced in garnishment</u>

**{¶101}** Based on the preceding analysis, we conclude that USDA revenue liens do not prevent East Liverpool from garnishing CFBank accounts. BWD's general argument that all of its revenues, regardless of the source of the revenues, is protected by the revenue lien, is rejected as it conflicts with Section 11, Article XII of the Ohio Constitution. The litigation reserve fund of $1,144,686.20 is excluded from the lien by the terms of the 2008 pledge agreement between BWD and the USDA. Any remaining amounts pledged to the USDA are subordinated to BWD's operational expenses pursuant to the terms of the pledge agreements. The East Liverpool water contract judgment is an operational expense that may be paid prior to any claim made by the USDA. Finally, BWD's failure to identify and segregate the source of the funds in any of the CFBank accounts precludes us from enforcing any aspect of the USDA lien. For all these reasons, we overrule BWD's second assignment of error.

## BWD'S ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN DENYING BUCKEYE WATER DISTRICT'S MOTION TO MODIFY THE COURT'S JUDGMENT ENTRY OF JANUARY 20, 2011 BECAUSE THE UNITED STATES DEPARTMENT OF AGRICULTURE HAS A LIEN ON THE FUNDS IN BUCKEYE WATER DISTRICT'S CAPITAL PROJECT FUND.**

**{¶102}** This assignment of error deals with funds that BWD labels as a "construction fund" or "capital project fund," that presumably are derived from a loan or grant from the USDA for some type of construction project. BWD's basis for this argument is a notation in their bookkeeping system. (9/6/11 Tr., Def. Exh. J.) BWD claims that $1.288 million is exempt from garnishment because permission is needed from the USDA to release these construction funds for anything other than construction projects. There is nothing in the record that supports such a conclusion. East Liverpool correctly points out that BWD changed its bookkeeping system after the garnishment process began, and that their previous bookkeeping system did not list these construction funds. (9/6/11 Tr., Pltf. Exh. Q.) East Liverpool also correctly notes that there is no other written documentation in the record supporting the existence of a USDA construction fund account, much less the origin or terms of the loan generating these funds. Nor does the record explain how the original construction fund money was spent, or how it should be spent in the future. There is some testimony from Mr. D'Angelo, BWD's fiscal officer, vaguely describing that sometime in 2007 or 2008 the USDA placed $800,000 in an escrow account to act as bond for a reservoir that had not yet been approved. (9/6/11 Tr., p. 115.) When the reservoir was approved, "then that money was released back to Buckeye Water District and put into the construction account for a future project." (9/6/11 Tr., p. 115.) Another $400,000 was later added to the same account. Mr. D'Angelo admitted that "[t]he 1,280,000 was not any revenues derived from the system". (9/6/11 Tr., p. 118.)

{¶103} We agree with the trial court that there is no evidence supporting any type of superior lien or claim on $1.288 million of construction funds. The record shows that two CFBank accounts are described as construction accounts. These accounts contain $735,456.55 and $1,000.00, respectively, so at most, there are $736,456.55 in purported construction funds being claimed as an exemption. Because Mr. D'Angelo testified that these funds were not revenues from BWD's water system, they cannot be protected with revenue liens. There is nothing else in the record that would categorize these funds as anything other than surplus funds available for any use by BWD. This third assignment of error is overruled.

## ASSIGNMENT OF ERROR BY THE OPWC

**THE TRIAL COURT ERRONEOUSLY HELD THAT BWD FUNDS OWED AND PLEDGED TO OPWC ARE SUBJECT TO GARNISHMENT.**

{¶104} The arguments presented by OPWC under this assignment of error are more or less repetitive of BWD's other arguments that have already been overruled. The first issue raised by OPWC is that BWD is exempt from garnishment due to governmental immunity. We have addressed this under BWD's first assignment of error. BWD is not entitled to claim political subdivision immunity as a defense to garnishment because breach of contract disputes are not protected under the immunity statute, R.C. Chapter 2744, and because the statute authorizing the

creation of a water district allows a water district to be sued on its contracts. R.C. 6119.06(D).

**{¶105}** OPWC's second issue is an attempt to relitigate the underlying contract dispute by implying that the contract did not conform to laws governing tax levies under R.C. Chapter 5705. OPWC argues that the underlying contract was invalid because it did not contain a certification of the fiscal officer of either BWD or Columbiana County that the amount required to meet the obligation was lawfully appropriated as required by R.C. 5705.41(D)(1), which states:

> Except as otherwise provided in division (D)(2) of this section and section 5705.44 of the Revised Code, make any contract or give any order involving the expenditure of money unless there is attached thereto a certificate of the fiscal officer of the subdivision that the amount required to meet the obligation or, in the case of a continuing contract to be performed in whole or in part in an ensuing fiscal year, the amount required to meet the obligation in the fiscal year in which the contract is made, has been lawfully appropriated for such purpose and is in the treasury or in process of collection to the credit of an appropriate fund free from any previous encumbrances.

**{¶106}** OPWC is aware that the funding certification requirement in R.C. 5705.41(D)(1) does not apply to contracts of a publicly operated water works when

these contracts are to be paid through the earnings of the water works. *See* R.C. 5705.44. The underlying contract dispute between East Liverpool and BWD is now a final judgment that was reviewed and affirmed on appeal, and a garnishment proceeding does not serve to reopen the underlying case to allow new issues to be raised to challenge the judgment. "[W]here a court of record has jurisdiction over the subject matter before it and renders a judgment, such judgment may not be collaterally impeached. So long as it stands unreversed, it remains conclusive as to the matter decided." *State ex rel. Schneider v. Brewer*, 155 Ohio St. 203, 205, 98 N.E.2d 2 (1951). The judgment cannot be challenged in an ancillary collection proceeding such as garnishment or attachment. *Federal Deposit Ins. Corp. v. Willoughby*, 19 Ohio App.3d 51, 482 N.E.2d 1267 (8th Dist.1984). OPWC's attempt to invalidate the East Liverpool water contract through a post-judgment garnishment action on the grounds that the water contract failed to meet the requirements of R.C. 5705.41(D)(1) is rejected.

{¶107} OPWC also relies on the funding certification requirement of R.C. 5705.41(D)(1) for a third argument. In this argument, OPWC concedes that the East Liverpool water contract was permitted to be paid through the earnings of BWD by virtue of R.C. 5705.44, which states:

> The certificate required by section 5705.41 of the Revised Code
> as to money in the treasury shall not be required for contracts on which
> payments are to be made from the earnings of a publicly operated

water works or public utility, but in the case of any such contract made without such certification, no payment shall be made on account thereof, and no claim or demand thereon shall be recoverable, except out of such earnings.

{¶108} OPWC assumes that the term "earnings" in this statute is distinct from the more general term "revenues" and means net profits after all expenses are paid. OPWC believes that BWD has no profits or "earnings" because its expenses are greater than its income. Thus, OPWC concludes that funds in the CFBank accounts cannot be used to pay the East Liverpool judgment because they do not represent actual earnings.

{¶109} We disagree with OPWC's conclusions for two reasons. First, the record does not indicate that BWC was consistently operating at a loss or that it had no net profits with which to pay East Liverpool. Plaintiff's exhibit O showed a net profit of $408,200 for 2010. Plaintiff's exhibit L showed a net profit of $964,404 for 2008. Since BWD has at times operated at a profit, we cannot conclude that it has no funds available to cover the East Liverpool water contract.

{¶110} Second, we disagree with OPWC's interpretation of the word "earnings" in R.C. 5705.44 as meaning "net profits." In *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 875 N.E.2d 561 (2007), the Ohio Supreme Court reviewed issues dealing with both R.C. 5705.41(D)(1) and R.C. 5705.44, and as part of that review, the high court used the term "earnings" in R.C. 5705.44 synonymously

with the term "revenues." *Id.* at ¶69. There is no indication in *St. Mary's* that the term "earnings" or "revenues" referred only to profits left over after the payment of all expenses. The common definition of earnings is "income," and we find no reason to apply any other definition here. *Black's Law Dictionary* 509 (6th Ed.1990).

{¶111} The longstanding interpretation of the public utility exception to the certification requirement of R.C. 5705.41(D) (and its predecessor G.C. 5625-33), is that all non-tax revenues of a public water works or public utility may be spent on contractual obligations without prior certification of a fiscal officer. *Cleveland Elec. Illuminating Co. v. City of Cleveland*, 50 Ohio App.2d 275, 363 N.E.2d 759 (8th Dist.1976); *Hines v. City of Bellefontaine*, 74 Ohio App. 393, 57 N.E.2d 164 (3d Dist.1943). The public utility exception has never been interpreted to refer only to the net profits of a public utility.

{¶112} Finally, OPWC argues that it has a secured interest in $40,532.96 that is superior to East Liverpool's judgment because those funds are pledged. The trial court determined that there was no pledge agreement between OPWC and BWD, and therefore, no basis to claim any type of superior lien or security interest. BWD's District Manager, Mr. DeAngelis, could not identify any specific agreement in which BWD pledged its revenues to OPWC. (3/24/11 Tr., pp. 85-87.) We cannot find any pledge agreement in the record that would protect the CFBank account purportedly holding OPWC funds, and we defer to the trier of fact on this factual point. All of OPWC's arguments are therefore overruled.

**Conclusion**

**{¶113}** Appellants have failed to show that governmental immunity has any bearing on the present garnishment action.  Both R.C. Chapter 2744 and 6119 allow a water district to be sued on its contracts, and the garnishment action in this case arises from a judgment entered in a breach of contract case.  BWD failed to show that a USDA lien on BWD's net revenues actually prevented East Liverpool from garnishing the CFBank accounts.  The record indicates that $1,144,686.20 in a litigation reserve fund was being held to help pay for this specific litigation, and therefore, is subject to garnishment.  The record indicates that the East Liverpool water contract is an operating expense, and as such, takes priority over the USDA revenue lien under the terms of the lien pledges.  BWD failed to trace the source of any of the allegedly exempt funds, and therefore, it could not establish that any of the CFBank accounts contained protected revenues.  BWD also failed to trace the source of the funds it identifies as protected construction funds, and without evidence of the source of the funds we have no basis for considering those funds to be exempt.  OPWC failed to identify a pledge agreement that would give it a priority lien superior to East Liverpool's judgment lien.

**{¶114}** In short, the trial court was correct that all of the seven CFBank accounts that were garnished were available for payment of East Liverpool's judgment, minus the amount designated for the OWDA reserve fund of $27,468.59.  The judgments of June 8, 2011 and December 13, 2011 are therefore affirmed, except for the following clarifications with respect to the total dollar amount that is

garnishable from the CFBank accounts. The evidence provided by East Liverpool and cited by the trial court identified $4,216,750.70 as the amount of garnishable funds that East Liverpool was requesting from the approximately $4.5 million in the CFBank accounts on or about January 18, 2011. Subtracting the OWDA reserve of $27,468.59 from $4,216,750.70 leaves a remainder of $4,189,282.11. This amount includes BWD's operating account (General Enterprise Account) ending in the digits 4209, which was valued at $829,940.47 on January 18, 2011. This operating account was released from the garnishment order and the freeze was lifted by the trial court on January 20, 2011. Although the General Enterprise Account is garnishable, we have no means of determining the amount (if any) remaining in the account at this time since it has been in constant use by BWD. We deduct the amount of the General Enterprise account as of January 18, 2011 from the net funds garnishable pursuant to this Opinion. The matter is remanded to the trial court for the orderly disposition of the entire garnishment order, including the garnishment of the funds in the General Enterprise account if so ordered by the trial court. Subtracting $829,940.47 from $4,189.282.11 leaves a remainder of $3,359,341.64 that may be garnished.

{¶115} We hold that the Ohio Water Development Authority has a protected interest of $27,468.59 in the CFBank accounts, and this amount may not be garnished. We hold that BWD's operating account (General Enterprise Account) ending in the digits 4209 is garnishable, but no funds shall be removed from this account pursuant to the garnishment order until specifically ordered by the trial court.

We hold that $3,359,341.64 may be garnished from the remaining six CFBank accounts. The case is hereby remanded to the trial court for the orderly disposition of the entire garnishment order and for further proceedings consistent with this Court's Opinion.

Donofrio, J., concurs.

DeGenaro, J., concurs.